100   453
107   534
100   453
154   283

JOHN T. RICH, GOVERNOR, ETC., V. THE BOARD OF STATE CANVASSERS.

*Elections—Returns— Constitutional amendment— Canvass—Mandamus.*

1. Where, after the Board of State Canvassers has canvassed the votes cast for and against the adoption of a constitutional amendment, and after the officers composing the board have gone out of office, it is made to appear that a palpable mistake was committed, due in part to the unauthorized rejection of the returns from one county, and in part to a fraudulent and criminal alteration of the returns from another county, thereby changing the result of the vote in the State, 'the succeeding board has authority to right the wrong thus committed by a recanvass of the vote, and may be required by *mandamus* to do so.

2. How. Stat. § 205, which provides that, in case no certified copy of the statement of the votes cast for and against the adoption of a constitutional amendment shall have been received from any county clerk by the Secretary of State, Governor, or State Treasurer within the time limited therefor, such Secretary shall forthwith send a special messenger to obtain such statement, evidences the intention of the Legislature that the error or omission of duty by the clerk should not result in disfranchising the voters of any county, and, if the instrument returned by the clerk is not conceived to be a sufficient return, it is the duty of the Board of State Canvassers to dispatch a messenger to obtain a correct copy of the canvass.

3. The failure to write out in words at length, in the statement of the votes cast for and against the adoption of a constitutional amendment, the number of votes given, and the use of numerals instead, is not such a departure from the provision of the statute as will justify the Board of State Canvassers in excluding the returns from a county so offending.

4. The provision of How. Stat. § 187, relative to writing out the result of the canvass in words at length, is *mandatory,* in the sense that the neglect to do so renders the parties guilty of such neglect liable to the penalty provided by the statute; but the people's remedy in such case lies in the punishment of the offenders, rather than in the disfranchisement of voters innocent of fraud.

*Mandamus.*     Argued February 20, 1894.     Granted May 22, 1894.

Relator applied for *mandamus* to compel the respondent board to reconvene, and recanvass the votes cast upon the question of the adoption of a proposed amendment to the Constitution relative to the salary of the Attorney General. The facts are stated in the opinion.

*Geer & Williams (Cahill & Ostrander,* of counsel), for relator.

*Smith, Lee & Day,* for respondent.

*A. A. Ellis,* Attorney General, *in pro. per.; Otto Kirchner,* of counsel.

MONTGOMERY, J. At the election held in this State in the spring of 1891, there was submitted to the electors a proposed amendment to section 1, article 9, of the Constitution, relative to the salaries of State officers, the effect of the amendment, if adopted, being to increase the salary of the Attorney General to $2,500 per annum. Upon the canvass as made by the Board of State Canvassers, the amendment appeared to have received a majority of 1,287 votes in the State, and the result was so determined and declared by the board. On the 29th of January of the present year, a petition was filed by the Governor, the Attorney General being the interested party, asking that the Board of State Canvassers be reconvened and required to recanvass the votes cast, the petition alleging that the board of 1891 failed in its duty, in that no canvass of the vote cast in the county of Gratiot was made, and that this county gave 1,316 negative votes on the proposition, and but 626 in its favor. The petition also alleges that the returns from the county of Gogebic were fraudulently changed by adding 1,000 to the affirma-

tive vote, so that, as a matter of fact, the amendment was defeated in the State by more than 400 votes.

There can be no question that the returns from Gogebic county were falsified. But it is insisted by the Attorney General that, the Board of State Canvassers having actually determined the result, there is no power to review its proceedings, either directly or collaterally, and that the determination must stand; and, secondly, that the returns from the county of Gratiot were irregular, and therefore the board was justified in throwing out the returns wholly, and was not bound to send a messenger for an amended return; and, thirdly, that, if it be held that the board neglected a duty in this last respect, the record of the canvass in Gratiot county shows that the statute relative to the canvass of votes was not complied with, and that a return taken from such record would not have been in a form which could have been recognized by the Board of State Canvassers, and hence that the forgery of the Gogebic returns did not in fact change the result, and that the recanvass of the returns would not result in reversing the determination reached by the board in its original canvass, as announced.

1. It is contended that the authority of the Board of State Canvassers in determining the question of whether a constitutional amendment has been adopted is similar to that exercised by a board of supervisors in canvassing the votes, and determining whether a proposition to remove a county-seat has been adopted; and that it has been held under various conditions that the Court will not review the decision of the board of supervisors in determining such result. *Attorney General v. Board of Supervisors,* 33 Mich. 289; *People v. Board of Supervisors,* 34 Id. 211; *People v. County Treasurer,* 41 Id. 6; *Hipp v. Board of Supervisors,* 62 Id. 456; *Attorney General v. Board of Canvassers,* 64 Id. 612; *Double v. McQueen,* 96 Id. 45.

The authority conferred upon the board of supervisors is defined in How. Stat. § 491, which, after providing for the submission of the question, the manner of voting, the canvass of the votes, and the transmission of the state-ment of the result to the county clerk, further provides as follows:

"The board of supervisors, for the purpose of ascertain-ing the result of such vote in such county, shall examine such statements and certificates, and canvass the votes therein certified, and shall determine and declare the result of the vote in the county, and such result shall be entered upon their record; and, in case the result shall be in favor of the proposed removal, *they shall provide for such removal, together with all the records and papers of such county, within one year after such result shall be ascertained and determined, as aforesaid, by them,* and shall remove the same as soon as suitable buildings shall have been provided for the recep-tion thereof, and they shall enter upon their records *the time when such removal shall be deemed to have taken place,* and from and after that time the place so designated *shall be* and *continue the county-seat of said county for all pur-poses whatsoever."*

In the first case cited, this statute was construed, and it was said:

"It is impossible, as it seems to us, to give due force to this language without holding that the decision of the supervisors was meant to be, and must be, conclusive. There is no intimation that any right to contest it was to be left open afterwards; but their action is to settle the question of the removal 'for all purposes whatsoever.' It could not settle that question if a judicial review were still the right of dissatisfied parties. The question was one of a nature peculiarly proper to be submitted finally to their determination, and this consideration is not with-out its force when the question is one of construction.

"But there are other considerations bearing in the same direction, which may be well illustrated by the present case. The diligence of the relator enabled him to present his complaint before the removal to Baldwin had been perfected, but that is a circumstance that may not exist in the next case that arises. The circuit judge is required

to hold his courts in the court-house provided for him, and he cannot lawfully hold them elsewhere, except when the county has no court-house at all. The officers of the court—the sheriff and clerk—are required to keep their offices and records at the county-seat. If the circuit court in chancery could take cognizance of this case, it can of any similar case; and perhaps in the next case, sitting at the new county-seat, it will be called upon by informa- tion to make solemn decision that it has no authority to decide, and to take jurisdiction for the purpose of holding that, sitting where it does, it has no jurisdiction at all. This would be the anomalous and absurd position in which a judge might be placed if he should assume to take cog- nizance of such a question."

It will be observed that not only is the board to make the determination, but the same section provides for action by the board based upon this determination. The reasons for holding its decision final, which do not obtain in favor of the construction of the statute governing the board of canvassers which is contended for by counsel for the Attorney General, are strongly stated in the language of Chief Justice COOLEY, above cited.

Turning to the provisions for canvassing the votes on a constitutional amendment, we find that they read as follows:

How. Stat. § 213. "The secretary shall lay before the board the statement received by him of the votes given in the several counties for or against such amendment to the Constitution."

"SEC. 214. The board shall then proceed to examine such statements, and to ascertain and determine the result, and shall make and certify under their hands a statement of the whole number of votes given for, and the whole number of votes given against, such amendment of the Constitution, * * * and they shall thereupon determine whether such amendment to the Constitution * * * has been approved and ratified by a majority of the electors voting thereon, and shall make and subscribe on such state- ment a certificate of such determination, and deliver the same to the Secretary of State."

No action by the board, as a board, is to be predicated

upon this finding. The language is almost identical with that which provides for the canvass of votes for State officers and members of Congress,—sections 207, 208, and 209; the last section providing that—

"The said canvassers shall certify each statement made by them to be correct, and subscribe their names thereto; and they shall thereupon determine what persons have been, by the greatest number of votes, duly elected to each respective office, and make and subscribe on each statement a certificate of such determination, and deliver the same to the Secretary of State."

So, it will be seen that the duty is imposed upon the board of determining what person has been elected representative to Congress, by language just as imperative as that contained in section 214, relative to the determination of the question of whether an amendment to the Constitution has been adopted; yet we held in *Belknap v. Board of Canvassers*, 95 Mich. 155, that a recanvass of the vote for member of Congress might be directed by *mandamus* after the expiration of the term of office of the old board, and after such board had made the canvass, entered its determination, and issued a certificate.

It is contended that the determination of the question whether an amendment to the Constitution has been carried involves the exercise of political, and not judicial, power. If this be so, it follows that the promulgation of any purported amendment by the executive or any executive department is final, and that the action cannot be questioned by the judiciary. But, with reference to the conditions precedent to submitting a proposed amendment to a vote of the people, it has been repeatedly held, by courts of the highest respectability, that it is within the power of the judiciary to inquire into the question, even in a collateral proceeding. See *Koehler v. Hill*, 60 Iowa, 543; *State v. Tufly*, 19 Nev. 391; *Collier v. Frierson*, 24 Ala. 107; *Opinion of the Justices*, 6 Cush. 573; *State v.*

*McBride,* 4 Mo. 303; *State v. Swift,* 69 Ind. 505; *West-inghausen v. People,* 44 Mich. 269. It is to be noted that, under section 1 of article 20 of the Constitution of the State, no amendment can become a part of the Constitution until ratified by a vote of the people. One prerequisite is equally as essential as the other. The amendment must first receive the requisite majority in the Legislature, and afterwards be adopted by the requisite vote. The question here involved is not whether the Court will, in a collateral proceeding, go into proofs to ascertain whether the board of canvassers has committed an error, but whether in a direct proceeding, when it appears that a palpable mistake has been committed, due in part to an omission of duty and in part to a fraudulent and criminal alteration of the returns upon which the determination of the board is based, the board itself may not right the wrong committed, and may not be required to do so. It is not to be implied that the present board requires the mandate of this Court, except as an assurance of authority.

We have recently, in an unreported case of *Rich v. Board of State Canvassers,*[1] passed upon the identical question here involved. It is true this case was not argued, and, in view of the importance of the question, we should not feel bound to follow this holding, if convinced that we were then in error. But the consequences of holding that the determination of the board of canvassers is forever conclusive, and that no matter how flagrant the fraud perpetrated upon the board, or how gross its own neglect of duty, the determination is to stand for all time, and an alleged amendment become a part of the organic law, which, it can be demonstrated beyond peradventure, never

---

[1] In this case, on January 18, 1894, a writ of *mandamus* was granted, requiring the board to reconvene, and recanvass the votes cast at the preceding April election upon four several proposed amendments to the Constitution, the same having been erroneously canvassed.

received the requisite vote from the electors, are such that we should adopt such construction of the statute only when convinced that no other is open. The able argument of counsel for the Attorney General has failed to convince us that the action of the board is not subject to direction by the Court by its process of *mandamus*. We are not able to find sufficient evidence of the legislative intention that the first determination of the board, induced by fraud, or reached by disregarding the mandates of the statute, is to be forever final. It is the *fact* of a majority vote which makes the amendment a part of the Constitution. We therefore adhere to the conclusion reached in the case of *Rich v. Board of State Canvassers*, above referred to.

There is abundant authority, not only in this State, but in other states, asserting the power of the court to compel by *mandamus* the reconvening of a board of canvassers and a recanvass of the vote. See *Smith v. Lawrence,* 2 S. D. 185; *Long v. State,* 17 Neb. 60; *State v. Hill,* 10 Id. 58; *People v. Hilliard,* 29 Ill. 413; *Ex parte Strong,* 20 Pick. 484; *State v. Garesche,* 65 Mo. 480; *State v. Board of State Canvassers,* 36 Wis. 498; *People v. Nordheim,* 99 Ill. 553; *State v. Berg,* 76 Mo. 136; Cooley, Const. Lim. (6th ed.) 784, note 5, and cases cited.

2. As the canvass made by the board, with the Gogebic vote corrected, would still show a majority in favor of the amendment if the vote of Gratiot county be not counted, it becomes necessary to inquire whether the board properly excluded the vote of this county. The only report from Gratiot county was as follows:

"ITHACA, MICH., fourteenth of April, 1891.

"Amendment to the Constitution relative to the salary of the Attorney General: Yes, 626 votes. Amendment to the Constitution relative to the salary of the Attorney General: No, 1,316 votes.

[Signed]          "I. N. Cowdrey, Clerk."
                   (With the seal attached.)

The statute provides (section 187):

"In each of said statements, the whole number of votes given, the names of the candidates, and the number of votes given to each shall be written out in words at length; and each statement shall be certified as correct, and attested by the signatures of the chairman and secretary of the respective boards, and a copy of each, thus certified and attested, shall be delivered to the county clerk, and recorded by him in a suitable book to be provided by him for that purpose, at the expense of the county, and kept in his office."

Section 190 provides that—

"The county clerk shall prepare and certify under his hand and seal of office three copies of the statement of votes given, * * * after he shall have received such statement from the board of county canvassers; each of which statements he shall seal up in an envelope, and direct one of each to the Governor, one of each to the Secretary of State, and one of each to the State Treasurer, and transmit the same by mail, within five days after the county canvass."

Section 193 provides that—

"Whenever any amendment shall have been proposed to the Constitution, and agreed to, and submitted to the people, pursuant to the provisions of the Constitution, the votes of the electors for and against such amendments shall be taken, canvassed, certified, and recorded, and certified copies of the statement thereof shall be made and transmitted by the several county clerks to the Governor, Secretary of State, and State Treasurer, within the same time and in the same manner as the votes for State officers are by law required to be taken and canvassed, and the statements thereof to be certified, recorded, and transmitted."

Section 205 provides that—

"If from any county clerk no such statement shall have been received by the Secretary o State, the Governor, nor the State Treasurer, within the times limited, the Secretary of State shall forthwith send a special messenger to obtain such statements and certificates from such county clerk; and such clerk shall immediately, on demand being

made by such messenger at his office, make out and deliver to him the statements and certificates required."

This last provision clearly evidences the intention of the Legislature that the error or omission of duty by the county clerk should not result in disfranchising the voters of any county. Under this section, if the instrument returned was not conceived to be a sufficient return, it was the plain duty of the board to dispatch a messenger to obtain a correct copy of the canvass. It is mockery to say that the paper is of sufficient authenticity to be treated as a return for the purpose of disfranchising the voters, and yet is not sufficiently formal to be recognized by the board. If it was so invalid as not to be considered a return for the purpose of being considered in the canvass, it was no return. Speaking to precisely the same point, the supreme court of Illinois, in *People v. Nordheim*, 99 Ill. 553, said:

"Inasmuch as these incomplete returns were, in contemplation of law, no returns at all, it follows that, at the time of this application, the judges and clerks of the election in those precincts had made no returns to the town clerk, as required by the statute."

It is apparent that the return was not a copy of the canvass, but it does not appear that it was excluded for this reason; but by a marginal entry in red ink it was stated that it was thrown out because of having no certificate of a notary public. In referring to a similar statute, the terms of which were that "the board may dispatch a messenger to the inspectors who made the returns, commanding them to complete the returns in the manner specified by law," the supreme court of Wisconsin, in *State v. Board of State Canvassers*, 36 Wis. 498, say:

"It is not necessary that a person should be a lawyer in order to know that the word 'may,' as first used in the statute above quoted, means 'must.' Any one would so read it who has sufficient intelligence to comprehend that

the preservation of our system of free government is impossible unless the will of the people, lawfully expressed through the ballot-box, is respected and obeyed."

We think it is altogether clear that there was a plain neglect of duty in failing to send a messenger for corrected returns.

3. It is insisted, however, that the *mandamus* ought not to issue, for the reason that the original canvass of Gratiot county appears so imperfect that, if a copy of the same had been before the board, the vote should not have been counted. We have before us a duly-authenticated copy of the canvass, a copy of which has been also returned to the Governor, Secretary of State, and State Treasurer. So much of the canvass as relates to the constitutional amendment is as follows:

"At the general election held on Monday, the sixth of April, in the year 1891.    *    *    *    *    *    *    *    *
"The whole number of votes given for the amendment to the Constitution relative to the Attorney General's salary was 1,942, and they were given as follows:
"Amendment to the Constitution: Yes, 626.
"Amendment to the Constitution: No, 1,316."

Appended to this is a certificate that the statement of votes is correct. On the opposite page also appears a tabulated statement of the votes cast in the townships and wards of the county. The particular infirmity alleged in the canvass is that the number of votes cast for and against the amendment is not written out in words at length, but numerals are employed instead. We think this is not such a departure from the provision of the statute as would have justified the Board of Canvassers, or will now justify it, in excluding the returns of this county. The provisions relating to the canvass and return are usually held so far directory as that if, from the returns, the true facts can be ascertained, they will not

be excluded in the canvass. As is stated in Paine on Elections (section 585):

" An election will not be invalidated by mere neglect or irregularity on the part of the officers in making up the returns, if the will of the voters, legally expressed, can be ascertained with certainty."

See, also, *State v. Bailey*, 7 Iowa, 390; *Opinion of Justices*, 70 Me. 560; and *Easton v. Scott*, 1 Cong. Elect. Cas. 273, in which last case this precise question is ruled.

It should be stated, however, that the provision of the statute relative to writing out the result of the canvass in words is mandatory, in the sense that the neglect to do so renders the parties guilty of such neglect liable to the penalty provided by the statute. The people's remedy in such case lies in the punishment of the offenders, rather than in the disfranchisement of voters innocent of fraud.

Since this case was submitted, a motion has been made to amend the answer, based upon an affidavit of the former clerk of Gratiot county, I. N. Cowdrey, which tends to show that the board of canvassers never completed and signed a proper canvass of the votes on the amendment, but that, after tabulating the returns and ascertaining the result, it was left with the clerk to make up the statement, and that he did so, attaching the name of the chairman. The clerk files a subsequent affidavit, stating that he never made oath to the first purported affidavit, and also stating that the vote on the Attorney General's salary was canvassed in the same manner as the vote on Justice of the Supreme Court and Regents of the University, except that the signature of the chairman of the board was not attached to the return made to the Governor, Secretary of State, and State Treasurer. There is nothing to impeach the substantial correctness of the canvass as made, and, if the second affidavit of Mr. Cowdrey be accepted, there was no irregularity which would not have been cured by

the performance of a duty imposed by statute upon the Board of State Canvassers; for, while it does appear that the return to the State officials was not signed by the chairman, it does not appear but that the county canvass, which is a distinct thing, was. But a less technical answer is that if this irregularity had, at the time, been called to the attention of the court, any imperfections in the canvass could have been directed to be corrected by *mandamus;* and it is not too much to assume that the State officials, having imposed upon them the duty of recording the will of the voters of the State, would, if necessary, have resorted to this course. After the lapse of this length of time, when the remedy is possibly lost to the State, we will not permit the record to be impeached except by showing that there has been an actual substantial error, working prejudice, which fact does not appear here. On the contrary, it appears that the record shows substantially the correct state of the vote. If any clerical error exists, it is not sufficient to affect the result in any way. Inasmuch as the error, if any, consists simply in a want of due authentication, we adopt the course pursued in *People v. Nordheim, supra,* and treat the record as sufficient, without going through the form of reconvening the board.

Whether the State is entitled to recover any portion of the salary paid during the period since the determination made by the Board of Canvassers, in 1891, if the services were rendered in good faith, and in the belief that the amendment had in fact received the requisite vote, we do not determine, as the question is an important one, and has not been discussed.

The writ of *mandamus* will issue.

The other Justices concurred.