THOMPSON *v.* SECRETARY OF STATE.

1. CONSTITUTIONAL LAW—REFERENDUM—ELECTIONS.
    The referendum provisions of the new Constitution are self-executing.

2. SAME—FILING OF PETITION—SECRETARY OF STATE—FRAUD.
    Section 1, Art. 5, of the Constitution relating to the initiative and referendum does not authorize the secretary of State to go behind the petition: his action must be based upon the face thereof as it is received and filed, and that official cannot investigate the truth of averments that many frauds and irregularities were perpetrated before the filing and that people were allowed to sign it who were not electors, etc.

3. SAME—MANDAMUS—MINISTERIAL DUTIES.
    His duties being of a ministerial character, he may be required to perform them by the writ of mandamus. They are not political in their nature: the jurisdiction of the court does not so much depend upon whether the duty is prescribed by the legislature, instead of the Constitution, as it does upon the nature of the duty imposed.

4. SAME—PARTIES—ELECTORS.
    The interest which the electors have in the determination of an important public question may in the discretion of the court be held to be sufficient to warrant them in becoming relators in mandamus to require the secretary of State to properly perform his official duties in submitting or refusing to submit to the voters a referendum petition.

5. SAME—PETITION—NUMBER OF SIGNERS—ELECTION.
    One-twentieth of the voters may suspend the operation, until the next general election, of any act of the legislature, except those making an appropriation, and acts necessary to preserve the public peace, health, etc. Accordingly, every safeguard provided by law against its irregular exercise should be carefully maintained. The official should be careful to observe that the various sections of the petition comply with the requirements of the Constitution, fairly construed: each of which is mandatory.

6. SAME—ORIGIN—SECTIONS OF PETITION.

The sections of the petition must come from the various county clerks of the counties in which they were circulated. The secretary of State has no authority to receive sections that have not been so filed. All sections of the original petitions circulated in any county must have been filed at the same time.

7. SAME.

But where the various sections of a petition coming from any county show upon their face that some were filed at one time and some at another, all subsequent to the first filing should be rejected. The sections must be valid and must have been first filed with the several county clerks.

8. SAME—IRREGULARITY.

Those that show on their face that they were filed in violation of the Constitution are as ineffectual as if they had never been filed at all.

9. SAME—PETITION.

The Constitution contemplates but two petitions on any referendum, an original petition and a second petition, which is supplemental and distinct. The sections going to make up the supplemental petition cannot be filed in the office of the county clerk until after the original petition has been transmitted to the secretary of State.

10. SAME—REFERENDUM—PETITIONS—RESIDENCE—OTHER REQUIRE-MENTS.

It is required by the Constitution, Art. 5, § 1, that the sections bear the name of the county or city in which they are circulated and each signer shall add the street number and election precinct to his name, the evident purpose of the provisions being to prevent duplication of signatures and fraudulent use of the referendum by persons not electors: accordingly, strict compliance with the constitutional requirements is imperative. The place of residence and of circulation must be shown on every section: names cannot be counted which do not conform to these provisions.

11. SAME—PETITION—ABBREVIATIONS—FRAUD.

In giving his residence a petitioner may make use of common and well known abbreviations: ditto marks are admissible; but the fact that several names on a section

192 Mich.—33.

appear to be in the same handwriting does not sufficiently show fraud to permit the secretary of State to reject them in canvassing the petitions.

12. SAME—AFFIDAVIT—SUFFICIENCY.

Without the constitutional affidavit attached to the sections of the petition it can have no validity.

13. SAME—RESIDENCE.

The solicitor must be an elector of the county in which he secures signatures to the petition.

14. SAME—ALTERATIONS.

Since sections of a petition that have been filed with the county clerk have passed out of the control of the promoters of the petition they may not afterwards be amended by opponents or by signers who favor the petition.

15. SAME—RECANVASS—MANDAMUS.

Evidence that several thousand alterations were made in the petitions from Wayne county filed in the office of the secretary of State, who for a time returned them to the county clerk, was enough to prevent the respondent from canvassing those sections of the petition and a mandamus of this court will prohibit him from including them in the recanvassing.

Mandamus by Ethan W. Thompson and others against Coleman C. Vaughan, secretary of State, to compel a recanvass of petitions for a referendum filed in the office of the secretary of State, and to secure a lawful submission of the question to the electors. Submitted July 22, 1916. (Calendar No. 26,993.) Writ granted September 2, 1916.

*Carroll, Kirwin & Hollway* and *Brown, Walbridge, Kelley & Seelye,* for relators.

*Grant Fellows,* Attorney General, and *L. W. Carr,* Assistant Attorney General (*Arthur P. Hicks* and *Stuart E. Knappen,* of counsel), for respondent.

PERSON, J. This is an application for a writ of mandamus by which the secretary of State shall be

required to recanvass a petition filed with him under the referendum clause of the Constitution. Some phases of the case were necessarily considered by this court in the framing of an issue of fact under the pleadings. 191 Mich. 303 (157 N. W. 1067). That issue, namely, "Do the petitions from Kent and Wayne counties, on file with the secretary of State, appear, upon their face to be regular and to comply with the constitutional provision, article 5, section 1?" was reserved by this court to be determined through an inspection of the petitions themselves. Such inspection has been had, and the case is now before us for final determination. The important facts from which the contest has arisen, and which are without dispute, are as follows:

At the session held in the year 1915, Senate Enrolled Bill No. 93 passed both branches of the legislature, received the approval of the governor, and became Act No. 304 of the Public Acts of 1915 (2 Comp. Laws 1915, § 9388). Its title shows its general purpose:

"An act to amend section one of act number one hundred sixty-nine of the Public Acts of nineteen hundred thirteen, entitled 'An act to define what shall constitute fraternal beneficiary societies, orders or associations; to provide for their incorporation and the regulation of their business, and for the punishment for violations of this act, and to repeal all existing acts or parts of acts inconsistent therewith,' approved May two, nineteen hundred thirteen."

The final adjournment of that session of the legislature took place on the 25th day of May. Before the expiration of ninety days thereafter a petition under the provisions of section 1, art. 5, of the Constitution, as amended in 1913, was filed with the secretary of State, asking that the aforesaid act be submitted to the electors for approval or rejection. Upon a canvass

of this petition the secretary of State decided that it had been signed by the requisite number of qualified electors; and on the 24th day of August, 1915, he made his proclamation to that effect. A copy of the material portion of this proclamation appears in *Thompson* v. *Secretary of State, supra.* The consequences of the petition, if sufficient, and of the proclamation, if warranted by the petition, will more fully appear upon a consideration of section 1, art. 5, of the Constitution, which, so far as material to this case, reads as follows:

"The legislative power of the State of Michigan is vested in a senate and house of representatives; but the people reserve to themselves the power to propose legislative measures, resolutions and laws; to enact or reject the same at the polls independently of the legislature; and to approve or reject at the polls any act passed by the legislature, except acts making appropriations for State institutions and to meet deficiencies in State funds. The first power reserved by the people is the initiative.    *    *    *

"The second power reserved to the people is the referendum. No act passed by the legislature shall go into effect until ninety days after the final adjournment of the session of the legislature which passed such act, except such acts making appropriations and such acts immediately necessary for the preservation of the public peace, health or safety, as have been given immediate effect by action of the legislature.

"Upon presentation to the secretary of State within ninety days after the final adjournment of the legislature, of a petition certified to as herein provided, as having been signed by qualified electors equal in number to five per cent. of the total vote cast for all candidates for governor at the last election at which a governor was elected, asking that any act, section or part of any act of the legislature, be submitted to the electors for approval or rejection, the secretary of State, after canvassing such petition as above required, and the same is found to be signed by the requisite number of electors, shall submit to the electors for approval or rejection such act or section or part of any act at

the next succeeding general election; and no such act shall go into effect until and unless approved by a majority of the qualified electors voting thereon.  \*  \*  \*

"Any initiative or referendum petition may be presented in sections, each section containing a full and correct copy of the title and text of the proposed measure.  Each signer thereto shall add to his signature, his place of residence, street and number in cities having street numbers, and his election precinct.  Any qualified elector of the State shall be competent to solicit such signatures within the county in which he is an elector.  Each section of the petition shall bear the name of the county or city in which it is circulated, and only qualified electors of such county or city shall be competent to sign such section.  Each section shall have attached thereto the affidavit of the person soliciting signatures to the same, stating his own qualifications and that all the signatures to the attached section were made in his presence, that each signature to the section is the genuine signature of the person signing the same, and no other affidavit thereto shall be required.  Such petitions so verified shall be *prima facie* evidence that the signatures thereon are genuine and that the persons signing the same are qualified electors.

"Each section of the petition shall be filed with the clerk of the county in which it was circulated, but all said sections circulated in any county shall be filed at the same time.  Within twenty days after the filing of such petition in his office, the said clerk shall forward said petition to the secretary of State.  Within forty days from the transmission of the said petition to the secretary of State, a supplemental petition identical with the original as to the body of the petition, but containing supplemental names, may be filed with the county clerk, and such supplemental petition shall be forwarded to the secretary of State by said clerk within ten days after the filing of the same."

Following the proclamation by the secretary of State, and in the following October, relators filed their petition herein, praying that a writ of mandamus issue from this court to the secretary of State, requiring him:

"(A) To recount and recanvass on said referendum petitions filed from the counties of Kent and Wayne, only those signatures of signers thereof who added to their respective signatures their place of residence, street and number in cities having street numbers, and their election precinct.

"(B) To recount and recanvass on said referendum petition only these sections which bear the name of the city or county in which it was circulated.

"(C) To recount and recanvass on said referendum petition only the signatures of such qualified electors, of the city or county where such section was circulated.

"(D) To recount and recanvass only those sections which have attached thereto an affidavit of the circulator or solicitor who circulated the said section, which complies with the requirements and provisions of section one of article five of the Constitution of this State.

"(E) To recount and recanvass only those sections of said referendum petition which were filed with the clerk of the county in which it was circulated, and to count and canvass only the names on such section circulated in the counties of Kent and Wayne which were filed at the same time as provided in section one of article five of the Constitution.

"(F) To reject and throw out of the said referendum petition all of the said sections thereof filed from the counties of Kent and Wayne which were returned to said counties for correction as set forth herein.

"(G) To reject and throw out of the said referendum petition all and each and every section thereof filed from the counties of Wayne and Kent and shown to be defective and illegal in this petition.

"(H) That such other and further order may be made in the premises as justice may require.

"And your petitioners will ever pray," etc.

And in their petition relators aver, among other things, that of the 32,809 signatures counted by the secretary of State on the referendum petition, 14,295 were on sections forwarded from the office of the county clerk of Kent county, and 10,589 were on sections forwarded from the office of the county clerk of Wayne

county; that the first 118 sections from Kent county were filed in the office of the county clerk on the 4th day of August, and forwarded to the secretary of State on the 12th day of August; that when forwarded to the secretary of State they did not, in many instances, show the county or city in which they had been circulated, nor the residences or election precincts of the signers, and that they were, in other respects, irregular and insufficient; that they were returned to the office of the county clerk, at his request, and by him turned over to interested parties who, without the knowledge of the signers, added their supposed residences and election precincts, and made other corrections and additions; that these sections were refiled in the clerk's office as of the 21st day of August, and again forwarded to the secretary of State with 93 additional sections containing more than 6,000 additional names, many of which had been written in without the knowledge of the purported signers. They also aver that the sections from Wayne county were in like manner returned to the county clerk of that county where they passed into the hands of interested parties, who filled in residences, election precincts, and other necessary data, as was done in Kent county, before their return to the secretary of State. They also aver that of the 149 sections from Wayne county the first 52 were filed in the office of the county clerk on the 4th day of August, and that the balance of the sections were filed in that office on the 5th day of August. And relators further aver that many of the names counted by the secretary of State are forgeries; that many others are names of men who are not electors; that many names were counted which on the face of the petition should be rejected, and that if only those names were counted that are entitled to be counted, the number would fall far short of 5 per cent. of the vote cast for governor at the last election. It is also insisted by relators that

section 1, art. 5, of the Constitution, as amended, is not self-executing, and that further legislation is required before it can become effective.

As to the last proposition, it cannot be held that this section of the Constitution is not self-executing. There is nothing in its language to indicate that it was to remain in abeyance until given life by legislative enactment. It is said in Cooley on Constitutional Limitations (7th Ed.), p. 121:

"A constitutional provision may be said to be self-executing, if it supplies a sufficient rule, by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law."

The section of the Constitution under consideration is not a mere statement of principles. On the contrary, it points out in detail the various steps to be taken in referring an act of the legislature to the electors, and undoubtedly intends that the conduct of the election and the canvass and return of votes shall be in accordance with the general laws of the State. And the legislature in its session of 1915 made certain amendments to the general election laws, with the evident purpose of adapting them more fully to the requirements of the referendum. Perhaps further action by the legislature may be advisable in aid of the constitutional provision; but, so far as the proceedings are under review in this case, the course to be taken is plainly pointed out, and this court should not, at the present time, enter into a minute investigation for the purpose of discovering whether there may not be somewhere in the election laws an inapplicable provision, or a step not clearly provided for. Generally, as to when a constitutional provision is self-executing, see *Willis* v. *Mabon*, 48 Minn. 140 (50 N. W. 1110, 16

L. R. A. 281, 31 Am. St. Rep. 626) ; *Ex parte Wagner,* 21 Okl. 33 (95 Pac. 435, 18 Am. & Eng. Ann. Cas. 197) ; *Stevens* v. *Benson,* 50 Or. 269 (91 Pac. 577) ; *State* v. *Langworthy,* 55 Or. 303 (104 Pac. 424, 106 Pac. 336) ; *State* v. *Harris,* 74 Or. 573 (144 Pac. 109, Am. & Eng. Ann. Cas. 1916A. 1156; *Gherna* v. *State,* 16 Ariz. 344 (146 Pac. 494).

It is averred by relators that the referendum petition was the subject of many gross frauds and irregularities before it was finally received and placed on file in the office of the secretary of State; that people were allowed to sign it who were not electors, and that many names were appended to it by interested parties without the knowledge or consent of those whose names were so appended; and the serious consequences to the State are pointed out if it should be held that the secretary is required to act upon such petition without making an investigation into the alleged frauds and irregularities.    The gravity of these charges is fully recognized, but the law must be construed as it stands. It is clear that the secretary of State is not given authority to enter upon such an investigation.    This was practically held in *Thompson* v. *Secretary of State, supra,* and we are obliged to adhere to the view taken in that opinion.    The duties charged upon the secretary by the referendum section of the Constitution are purely ministerial, and his action must be based upon the face of the petition as it is received at his office. Other evils of a serious nature might result if initiative and referendum petitions could be held up pending investigations of uncertain length, and those evils were undoubtedly in mind when the constitutional amendment was framed and adopted without making provisions for such an investigation.

The duties of respondent being ministerial and not discretionary, he may be required to perform those duties by the issuance of the writ of mandamus.    The

jurisdiction of the court does not so much depend upon whether the duty is prescribed by the legislature, instead of the Constitution, as it does upon the nature of the duty imposed. *Sutherland* v. *Governor,* 29 Mich. 320 (18 Am. Rep. 89); *Ambler* v. *Auditor General,* 38 Mich. 746. Nor are the duties required of respondent by this section of the Constitution political in their nature. They are certainly no more political than are the conditions precedent to the submission of a constitutional amendment to a vote of the people, or the canvassing of such vote after it has been submitted. In regard to each of these matters the jurisdiction of the court has been upheld. *Rich* v. *Board of State Canvassers,* 100 Mich. 453 (59 N. W. 181); *Livingstone* v. *Wayne Election Commissioners,* 174 Mich. 485 (141 N. W. 122). And see *Ayres* v. *Board of State Auditors,* 42 Mich. 422 (4 N. W. 274); *Beakes* v. *Board of State Canvassers,* 172 Mich. 408 (137 N. W. 958).

It is also objected that the relators have no such interest as entitles them to institute these proceedings. But, as was pointed out in *Ayres* v. *Board of State Auditors, supra,* that is a matter of discretion on the part of the court, and not of law. And whether the attorney general was requested to act, as averred in relators' petition, or not, the very able brief filed by him in these proceedings is so adverse to relators' contentions that it must be assumed he could not well have done so. The relators are electors of this State interested in the proper administration of the law; and, under the circumstances of this case and the public importance of the questions raised, the objection to their instituting these proceedings will not be sustained.

Under the referendum clause of the Constitution one-twentieth of the electors of the State may suspend the operation, until the next general election, of any

act of the legislature, however important, except acts making appropriations and such as are immediately necessary for the preservation of the public peace, health, and safety. And, as in this case, such suspension may be for more than a year. Where a power so great as this is vested in a minority of the people, every safeguard provided by law against its irregular or fraudulent exercise should be carefully maintained. It is true that no issues have been framed to determine the truth or falsity of the charges of fraud made by relators in this case. This is because respondent is not given any power to investigate those charges, and mandamus will issue only to compel the performance of a plain legal duty. He must canvass the petition as it is filed in his office, and can look no further. But he should be careful to see that its various sections comply with the requirements of the Constitution fairly and reasonably construed. Whatever other purpose these requirements may have, it is plainly to be seen that each and every one was intended to safeguard the honesty of the petition. And each and every one is mandatory and must be complied with.

The sections of the petition must come to the secretary of State from the various county clerks of the counties in which the sections were circulated. The secretary of State has no authority to receive and act upon a petition received from any other source. And these various sections must have been filed with the county clerks of the counties in which they were circulated. The secretary of State has no authority to receive sections that have not been so filed. And all sections of the original petitions circulated in any county must have been filed at the same time. These are plain requirements of the Constitution. Whether sections forwarded to the secretary of State by a county clerk will be presumed to have been rightly received and filed by the latter in the absence of any indication

to the contrary is not here determined, because the question is not raised by anything that appears on the face of the petition.

But where the various sections of a referendum petition, coming from any county to the secretary of State, show upon their face that some were filed at one time and some at another, all subsequent to the first filing should be rejected, and none of the signatures thereon should be counted by the secretary of State in his canvass. By an inspection of the referendum petition under consideration it is found that, of the 149 sections from Wayne county, 52 were filed in the office of the county clerk on the 4th day of August, 1915. The remaining sections were filed in that office at a different time, most, if not all of them, on the 5th day of August. On the canvass of the petition by the secretary of State all of these subsequent sections should have been rejected, unless the plain language of the Constitution is to be disregarded. The date of filing in the office of the county clerk is marked on each section, and these dates were stamped thereon when the sections were forwarded by the county clerk. Upon these sections from Wayne county the secretary of State erroneously counted upwards of 6,000 signatures.

It is argued in the briefs for respondent that the secretary of State has nothing to do with the time or manner of filing the sections of the petition with the various county clerks, and that his only duty is to count the signatures upon the petition. But the sections of the petition upon which he is to count the signatures must be valid sections, and must have been first filed with the various county clerks. He can act only upon sections that have been so filed. And sections which show upon their face that they were filed in violation of the Constitution are as ineffectual as if they never had been filed at all.

It is also urged that the sections filed with the county clerk at later dates may be treated as a supplemental petition. To do this would be to deprive of meaning that clause of the Constitution which says "all sections circulated in any county shall be filed at the same time." The Constitution contemplates but two petitions on any referendum, an original petition and a supplemental petition. These are separate and distinct. All sections in any county going to make up either petition must be filed at the same time. And the sections going to make up the supplemental petition cannot be filed in the office of a county clerk until after the original petition has been transmitted to the secretary of State. The language of the Constitution is:

"Within forty days from the transmission of the said petition to the secretary of State, a supplemental petition, identical with the original as to the body of the petition, but containing supplemental names, may be filed with the county clerk, and such supplemental petition shall be forwarded to the secretary of State by said clerk within ten days after the filing of the same."

The evident purpose of a supplemental petition is to supply any deficiency that may have been found in the original petition after it has been transmitted to the secretary of State. The sections from Wayne county were all filed with the county clerk, as parts of the original petition, before any portion of them had been transmitted to the secretary of State, and all were transmitted to the secretary of State at one time.

Relators also insist that respondent counted signatures upon sections of the petition which did not show the county or city in which they were circulated, and that he counted others where the residence or voting precinct was not given. It is required by the Constitution that:

"Each section of the petition shall bear the name of the county or city in which it is circulated"

—and also that:

"Each signer thereto shall add to his signature his place of residence, street and number in cities having street numbers, and his election precinct."

The evident purpose of these provisions is to prevent duplication of signatures, and the fraudulent use of the referendum by persons who are not electors. And to make these results more certain it is required that the sections circulated in any county or city shall be signed only by electors residing in such county or city. To secure the results aimed at by the Constitution each of these requirements must be strictly observed. It cannot be inferred that a section was circulated in a certain county or city from the fact that a majority, or all, of the signers gave their residences as in that county or city. Nor can it be inferred that the signers resided in a certain county or city from the fact that the section was circulated in such county or city. To permit either inference would defeat the object of the constitutional provisions. The place of circulation and the place of residence must each be shown by itself on every section. And the signatures cannot be counted on a section which does not thus show where it was circulated, nor can a signature be counted on any section unless it is followed by the signer's residence and voting precinct.

The inspection of the petition shows that these constitutional provisions were not complied with in all instances in the canvass made by respondent. Undoubtedly a signer to a referendum petition, in giving his residence, may use common and well-known abbreviations, if there are such designating his county or city, but his residence must not be left to guesswork or mere inference. And ditto marks have such a clear

and definite meaning that their use cannot be held objectionable. It is also claimed by relators that upon some of the sections of the petition there are many names, places of residence, and voting precincts all apparently in the same handwriting, and that from this it should be concluded that the names were written thereon fraudulently, and that they should be rejected from the canvass. An examination of the petition lends some plausibility to this claim; but similarity of handwriting is too much a matter of opinion, and the whole proposition is too indefinite, to be acted upon in such a canvass as the secretary of State is required to make.

It is also claimed by relators that signatures were counted upon sections of the petition to which no proper affidavit was attached. The Constitution requires that:

"Each section shall have attached thereto the affidavit of the person soliciting signatures to the same, stating his own qualifications and that all the signatures to the attached section were made in his presence, that each signature to the section is the genuine signature of the person signing the same, and no other affidavit thereto shall be required."

Without such affidavit a section has no validity whatever. It must, among other things, state the qualifications of the solicitor by whom it is made. He is required to be an elector within the county in which the section was circulated. When the Constitution says:

"Any qualified elector of the State shall be competent to solicit such signatures within the county in which he is an elector"

—it impliedly, and by a well-known rule of construction, precludes him from soliciting signatures in any county in which he is not an elector. The signatures upon any section must be excluded from the count unless the affidavit attached thereto affirmatively shows

that the person making it was an elector of the county in which the section was circulated. The affidavit must also have been made before the section was filed with the county clerk, and it cannot be changed after such filing.

After the various sections of the referendum petition from the counties of Wayne and Kent had been received at the office of the secretary of State, they were returned by respondent to the clerks of those counties, respectively. Afterwards they were again transmitted to the office of the secretary of State. Relators claim that this act of respondent in returning such sections of the petition was unauthorized and illegal, and that it destroyed the validity of every section returned, because, relators say, various changes were made by interested parties in the sections after their return to the county clerks, and that places of residence and voting precincts were inserted without the knowledge or consent of the signers. We agree that sections of a referendum petition once filed with a county clerk have passed out of the control of the promoters of the petition, and that the clerk, while they are in his office, and the secretary of State, after they have been filed with him, are as responsible for their safety and integrity as for the safety and integrity of any other paper filed with them. After the sections of a petition have once been filed they may not be amended by its friends, nor mutilated by its enemies. To permit the one would lead to the other. And, besides this, the result intended by the requirement of the Constitution that all sections in any county shall be filed at the same time would be frustrated. Respondent, however, in his answer to relators' petition, says that the sections from Kent had not been filed in his office when they were returned to the clerk of that county; and an inspection of the sections shows no filing mark at that time. They were therefore as

if they had not, as yet, been transmitted to the secretary of State.

But the 149 sections from the county of Wayne were filed in the office of the secretary of State on the 9th day of August, 1915. This is shown by the filing stamp of the department on each section, and is not denied by respondent's answer. And after being so filed, and while in the custody of the secretary of State, they were returned to the office of the clerk of Wayne county. Later these sections were brought back to the secretary of State with a letter from the county clerk, notifying the secretary that more than 3,800 changes and corrections had been made in the various sections while they were absent from his office. Respondent is required to canvass the petition and its various sections as they are filed in his office, and not as they may be afterwards changed for better or for worse. He says, in his answer, in substance, that he does not know what changes, if any, were made in the sections returned to Wayne county, which is the same as saying that he cannot make any assured canvass of these sections as they were filed. Under these circumstances the sections from Wayne county cannot be canvassed at all, and must be rejected. Their integrity is gone, and the verity of the affidavits attached thereto has been destroyed.

The writ of mandamus will issue, directing respondent to recanvass the referendum petition referred to, in accordance with the principles stated in this opinion, and to amend his proclamation so as to accord with the result of such recanvass, but without costs.

STONE, C. J., and OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred. KUHN and BROOKE, JJ., did not sit.