BOARD OF EDUCATION OF WARREN
COUNTY, Kentucky, and Board of Education of Bowling Green Independent School
District, Appellants,

v.

FISCAL COURT OF WARREN COUNTY,
Kentucky, etc., Appellees.

Court of Appeals of Kentucky.

Oct. 10, 1972.

Jerry L. Moore, Bell, Orr, Ayers & Moore, Bowling Green, for appellants.

Henry J. Potter, Jr., County Atty., Bowling Green, for appellees.

CULLEN, Commissioner.

In issue on this appeal is the sufficiency of a voters' petition presented to the Warren County Fiscal Court under KRS 160.-485, seeking a referendum on a resolution of that court, adopted pursuant to KRS 160.613 at the joint request of the Warren County and Bowling Green school districts, levying for school purposes a utility gross receipts tax of three percent. The fiscal court found the petition sufficient and ordered a referendum to be held at the regular 1972 election on November 7. The school boards appealed that order to the circuit court, which entered judgment upholding the order. The instant appeal is from that judgment.

KRS 160.485 (which is made applicable to the tax levy here in question by KRS 160.597) provides that the petition must contain the names and addresses of the signers, and that one or more persons "shall verify by affidavit the signatures *and addresses* of the signers of the petition" (our emphasis). The petition in the instant case contained the addresses of the signers but the verification was only that "the signatures appended thereto * * * are the signatures of the persons whose names they purport to be." Thus there was no verification of the addresses.

Construing a comparable statute, this court in Wiggins v. City of Winchester, Ky., 421 S.W.2d 843, held that a petition which did not *contain* the addresses of the signers was fatally defective. The court said: "Where a public vote is sought on a question such as the one presented here, the least the petitioners should do is to pat-

tern their petition on the requirements of the statute * * *."

If, as held in *Wiggins,* the *presence* of the addresses is an essential requirement, we can find no justification for a holding that the *verification* of the addresses is not essential, and that a petition lacking such verification substantially complies with the statute. We are compelled to hold to the contrary.

■ The statute requires that the petition be filed within 30 days following the adoption of the resolution levying the tax. In the instant case the resolution was adopted on March 3, 1972, and the petition was filed on March 16. Some six weeks later, on May 3, after the school boards had questioned the sufficiency of the petition, the fiscal court had found it valid, and the appeal had been taken to the circuit court, the proponents of the petition undertook to file new verifying affidavits which did verify the addresses of the signers of the petition. The insufficient petitions could not be made sufficient by such late action (not only after the time for filing had expired but after the matter had been appealed to the circuit court). See Thompson v. Vaughan, 192 Mich. 512, 159 N.W. 65; Kellaher v. Kozer, 112 Or. 149, 228 P. 1086; Kochen v. Young, 252 Iowa 389, 107 N.W.2d 81; In re Opinion of the Justices, 114 Me. 557, 95 A. 869.

The judgment is reversed with directions to enter judgment in conformity with this opinion.

STEINFELD, C. J., and EDWARD P. HILL, Jr., and MILLIKEN, JJ., concur.

PALMORE and REED, JJ., concur, each by separate opinion.

NEIKIRK and OSBORNE, JJ., dissent.

REED, Justice (concurring).

I concur in the result announced by the majority, but because of my dissent in Board of Registration Commissioners et al. v. Hallahan, County Clerk et al., Ky., 485 S.W.2d 759 (decided September 27, 1972) I am unable to subscribe to the opinion rendered without expression of my reasons for decision in this case. The majority appears to have done an about face. My position in both cases has at least the virtue of consistency, if it has no other saving grace.

It would appear that the license to completely ignore statutory language issued in the Hallahan case has been cancelled less than 30 days after that decision. In my view, the petitioners in this case came closer to compliance with the applicable statutes by a wide margin than was true in Hallahan. When the key words and phrases used in the Hallahan majority opinions are applied to the present case, the situation pattern appears disturbingly similar. Those key words and phrases are: "compelled," "purely technical," "facilitate," "not to obstruct," "reliance upon the construction placed upon the statutes in question by the constituted officials of the state and county." Significance was also attached to the purity of motives of those who construed the statutes, and that their construction was approved by the circuit judge was cited.

The majority told us in Hallahan that election statutes should be construed liberally to favor the right of suffrage. A respected text authority makes the statement, which is based on the majority of decisions on the issue, that provisions for referendum are liberally construed to execute their purpose, to facilitate and not to hamper the exercise by the voters of the rights granted thereby. 42 Am.Jur.2d, Initiative and Referendum, Sec. 5, p. 653. Therefore, this salutary but abstract principle applies in both cases. Nevertheless, the simple, elemental fact is that in neither Hallahan nor here did the concerned parties obey the clear requirements prescribed by the language of the legislature, and in both instances the legislative language evidenced a deliberate and discernable policy choice made by the law-making branch of

government while acting within the constitutional restrictions placed upon its power. Regardless of motivation or the claimed purity thereof, if contemporaneous construction ignores the clear language of the legislature that expresses a constitutionally permissible policy choice, it is my conviction that a court shirks its duty when it supinely validates such action whether its decision is popular or unpopular at that moment in time.

I submit that in legal circles, which doubtless influences the media in their comments on judicial performance, there is far too much reliance on labels. "Activist," "strict constructionist," "letter of the law man," "sterile literalist," "technicalities at the expense of justice," "continuity and stability at the cost of justice denied," are all hurled about with very little analysis. They are too often used as a kind of shorthand means of expressing passionate dissatisfaction with a particular result.

The argumentative logician or the expert propagandist would describe these expressions as "labels"; I call their indiscriminate use "slogan huckstering."

This case and the Hallahan case present rationales of decision that appear contradictory, particularly if one uses "the reaction of the man-on-the-street" as indicative of "common sense." I am firmly persuaded that the average man on the street today would experience considerable difficulty in understanding why, if existence of the right of suffrage validates a result to the effect that if honest, well-intentioned public officials agree to ignore the language of law prescribing reasonable standards to avoid fraud in the electoral process and a large number of people rely upon their construction, these actions are valid because the opposite result is not "compelled," then why another group of people who desire to exercise a legislatively granted right of suffrage concerning the imposition of a tax upon them for a non-specified period of time cannot exercise that right when they and the honest, well-intentioned public officials on whom they relied believed that a few week's tardiness in verifying the addresses of the signers of a petition to cause a public vote should not be fatal. It is decided, nevertheless, that the invalidity of their action despite their good intentions "compels" a result opposite to that reached in the first instance. In Hallahan most qualified citizens who desired to register could have properly registered in time to vote and in the instant case the addresses were verified in ample time to permit placing the proposition on the ballot. Surely the answer cannot be that courts are empowered to make a subjective choice, if the right of franchise is lawfully extended, that its exercise produces a better social result in some circumstances than in others—hence, it will strictly view in one instance and indulgently in another. Although some advocated a monarchy in the formative years of our nation, the scepter was to be offered to the executive —not to the judiciary.

If a monarchy had been instituted in this nation, I wonder if the judicial branch would have demonstrated the same courage as did Coke on the occasion of his appearance before James I.

"To this Coke answered on behalf of the judges that by the law of England the king in person could not adjudge any cause. All cases, civil and criminal, were to be determined in some court of justice according to the law and custom of the realm. 'But', said the king, 'I thought law was founded upon reason, and, I and others have reason as well as the judges.' 'True it was,' Coke responded, 'that God had endowed His Majesty with excellent science and great endowments of nature; but His Majesty was not learned in the laws of his realm of England, and causes which concern the life or inheritance of goods or fortunes of his subjects are not to be decided by natural reason, but by the artificial reason and judgment of the law, which law is an art which requires long study and experience before that a man can attain to cognizance of it.' At this the king was greatly offended saying that: in such

case he should be under the law which it was treason to affirm. Coke answered in the words of Bracton, that the king ought not to be under any man but under God and the law." (Pound, The Development of Constitutional Guarantees of Liberty, Yale University Press, 1957, pp. 45, 46.) One might reasonably suspect that the king regarded Coke's position as a stubborn reliance on "technicalities" at the expense of "justice." The action of the English common law judges in holding void the grant of a monopoly to sell playing cards by Elizabeth I as being "contrary to the common law and contrary to certain acts of Parliament," could hardly be regarded as common sense. To oppose a strong-willed, popular monarch contradicts the proposition that discretion is the better part of valor. Nevertheless, the flow of these decisions gave birth to the principle that if the sovereign undertook to act contrary to the Constitution, courts had the power and the duty to declare such acts void. The great John Marshall did not pick his principle out of the air or as the result of inspired revelation.

"Technicality at the expense of justice"? What distinguishes a "technicality" from a "deeply embedded principle that compels a result" is as elusive as is the meaning of "justice." A national publication reported that in a specified locality a significant number of citizens stated to a pollster that they were opposed to several of the provisions of the first ten amendments to the Constitution of the United States. The guarantee against unreasonable searches and seizures may be regarded as an arid "technicality" by the business man when it prevents the introduction of illegally seized evidence against an accused criminal; the same business man might demand its protection if the government sought to seize and search and read his first class mail because he had taken a position unpopular to the government; again, the same guarantee might be viewed as an arid "technicality" by the convicted petty thief when he sees the affluent business

man accused of an antitrust violation successfully plead the constitutional provision.

Another fashionable shibboleth is "continuity and stability at the cost of justice denied." That this catch phrase has attained the status of a slogan is evidenced by a fairly recent note in 60 Ky.L.J. pp. 236, 245. This note gratuitously misconstrues the opinion in Colley v. Colley, Ky., 460 S. W.2d 821, wherein the court construed several statutes applicable to divorce in this state. The thrust of the entire discussion in this note is an attempt to make the court say what it deliberately refused to say. The court did not say that the wife had to be free of fault in order to be entitled to alimony. The author of the note did not mention the existence of or the frequent amendments to KRS 403.020, the statute in force in which grounds for divorce were stated at the time of the opinion, nor did he mention or allude to KRS 21.060, which prohibits an appeal from that part of a judgment granting a divorce. The grounds statute had removed the requirement of a showing of freedom from fault in several instances including the ground commonly called "cruelty". The court had decided that although the prohibition against appeal from a judgment granting a divorce prevented a reversal of the divorce itself that did not prevent the appellate court from determining that a party was "legally entitled to a divorce" for purposes of property division and alimony even though that party was not free from fault in those instances, which represented probably over 90 percent of statutory ground cases presented. Thus sterile literalism was rejected in statutory interpretation to the extent permissible. The unfairness of regarding fault as a categorical imperative was pointed out. The hands of trial judges were untied. There was such a scholarly desire, however, to huckster a label that the existence of applicable statutes and decisions was either consciously or negligently omitted, in the interest of applying the label.

Although it may be represented that my dissent in Hallahan represents opposition to recent judicial precedent encouraging freer exercise of the right of franchise, this is simply incorrect. The legislature provided for a comprehensive overhaul of the electoral process to commence on December 1, 1972. On and after that date, if the legislature chooses as a policy decision to permit registration by mail without regard to "presence" or "absence," then my duty is to respect that language to carry out that policy in the decisional process. There is no constitutional stricture that prevents the legislative choice. Before that date the language and policy express to me a prophylactic requirement evidenced by the words "absent" and "absentee" that have at the bare minimum the direction that an applicant for registration must be absent from somewhere, somehow, sometime, in order to be eligible to register by mail. Whether the policies adopted in either instance are the wisest or the best solutions possible are judicially irrelevant.

Great jurists, with vastly greater abilities than mine, have frankly expressed their inability to define justice or to know what is really meant by that word. Holmes, who said the law was not logic but experience, was one of them. If statutory declarations are not the law, but mere evidence of it, and courts declare the law, the problem is really not eased. If law has a reason for existence, then it must represent a consistent application of acceptable principles developed from experience to situation patterns which present the same determinative elements of fact. This operation may be as representative of the concept of "justice" as human conditions allow.

I have no blind faith in sterile literalism nor in an inflexible "letter of the law" approach. Where the legislature has not occupied the field, or where it has occupied the field partially, or where legislative expressions are ambiguous or contradictory, then courts must express policy choices in order to resolve conflicting claims when disputants invoke the decisional process. If courts, however, relegate themselves to the status of a complaint and adjustment bureau of the legislature, then perhaps judges should be elected for two-year terms on a partisan ballot, as are members of the House of Representatives, in order to assure that their implementation and revision of legislative acts represent the will of the majority.

It is apparent that the device of popular referendum presents serious policy choices to a legislative body. On the one hand, it is argued that despite its inherent revision of traditional notions of a representative rather than a direct system of government, it is a healthy procedure that operates to prevent arbitrary action and is deeply rooted in the populist attitude. On the other hand, it is asserted that since the people elect their representatives and may periodically remove and replace them by other representatives who have the power to repeal prior actions and substitute others, it is a singularly unworkable process if elected representatives have responsibilities imposed upon them, but are subjected to a device which bars them from carrying out their assumed responsibilities; particularly in issues concerning the public health, safety, morals or welfare, it is argued that the referendum device creates a system of government consisting of all checks and no balance.

In the case before us, the legislature could have subjected every decision of the school board to an unlimited referendum by the citizens who elected it, or it could have denied the referendum device entirely. The legislature chose a middle ground and made a policy choice; a strictly circumscribed and limited right of referendum was extended where the elected and responsible representatives of the people decided that the imposition of the particular legislatively authorized tax was needed for a more adequate school system. The statute required that the addresses of the signers to the petition for the referendum be verified. This data was as important as

the signatures themselves because it went to establish whether or not the signer was qualified. 42 Am.Jur.2d, Initiative and Referendum, Sec. 29, p. 677. It is conceded that the addresses were not verified within the statutory time granted to file the petition. Generally, omission of the verification cannot be corrected after the time for filing the petition has expired. 42 Am.Jur.2d, Initiative and Referendum, Sec. 36, p. 684. The legislative conditions were not complied with; hence, the petitioners must be relegated to their remedy of the elective process of the representatives who made the decision that this action was necessary to carry out their responsibilities of office.

I do not reach the result as an exercise in literalism nor with a joyous "letter of the law" confidence. The motives of the concerned public officials or of the petitioners must, in my view, be regarded as irrelevant. The legislative policy choice is clearly expressed. "Liberal" construction may indulge relatively insignificant curable variations in form, but in view of the total context, outright and complete noncompliance cannot be afforded such treatment.

I concur in the reversal of the judgment.

PALMORE, Justice (concurring).

It is with much reluctance that I am forced to concur in the majority opinion, but I cannot avoid the conclusion that the law is too plain to do otherwise. No one actually contends with a straight face that these petitions complied with the express provisions of the statute. The undisputed fact of life is that they did not. The only question is whether the deficiency was fatal. There are two possible theories under which it might be found not so. One is that when the legislature enacted the requirement that someone verify the "signatures *and addresses*" (emphasis added) it really intended that only the signatures need be verified. That is the avenue taken by the dissenting opinion, and I am unable to swallow it. It could just as reasonably be argued that the addresses themselves

were not essential so long as the signatures were good, but as the majority opinion points out, that has been settled to the contrary.

That the signers themselves did all they were required to do cannot be the answer in this case, because the statute requires additional action by other people—that is, some one or more persons must thereafter execute affidavits verifying the signatures and addresses. The petitions presented to the fiscal court within the statutorily-allotted 30 days simply were not supported by affidavits which complied with that requirement.

At first I thought that perhaps the filing of proper verifying affidavits after expiration of the 30-day period could be regarded as a ministerial sort of corrective action, similar to the correction of a record or amendment of the return on a summons or other process. This, I believe, was substantially the view taken by the circuit court, and it would be perfectly sound except for the fact that the law seems to be pretty well settled that if a referendum petition is not made good within the time in which it must be filed it cannot be made so afterward. As once observed by the court of a sister state, "After the sections of a petition have once been filed they may not be amended by its friends, nor mutilated by its enemies. To permit one would lead to the other." Thompson v. Vaughan, 192 Mich. 512, 159 N.W. 65, 70 (1916).

That the people are denied a direct and immediate vote on this matter results not from what this court wishes or decrees, but from the restrictions enacted by the legislature and from somebody's failure to comply with those restrictions. We are not justified in changing the law that will apply to future cases in order to rectify a mistake made in one case.

In another concurring opinion it is suggested that the position taken by the majority in Board of Registration Com'rs v. Hallahan, Ky., 485 S.W.2d 759, decided a week or two ago, was inconsistent with the

position now taken in this case. However, there is room for an honest difference of opinion on that subject, and I do not see that the two cases are at all analogous. In *Hallahan* the inquiry was directed to what was the legislative intent deducible from a hodge-podge of old and new statutes which, from the standpoint of draftsmanship, had not been too expertly fitted together. Of one thing I am reasonably certain—that the result of the majority opinion in that case was exactly what the legislature intended. That, after all, is or should be the objective sought by any philosophy of statutory construction. Here there is no question at all as to what is meant by the statute. In fact, as already observed, no one really contends that the petitions conformed to its literal requirements.

OSBORNE, Justice (dissenting).

I dissent from the majority opinion in this case primarily because of the peculiar wording of KRS 160.485. That Act, in setting out the requirements for the petition, states:

"Each sheet of the petition shall contain the names and addresses of the voters in but one (1) voting precinct, and each sheet shall state the name, number, or designation of the precinct and, where applicable, the name, designation, or number of the district or ward wherein the precinct is situated."

Apparently, the legislature had in mind here that this information would be placed upon the sheet by the person collecting signatures for the initiative. As to the duty of the voter when signing the petition, the statute provides:

"Each voter shall sign his name in the same manner in which he signed the current registration form described in KRS 117.630 or subsection (2) of KRS 117.-720, as the case may be. If the signature is difficult to read, the voter shall, on the same line legibly write or print

his name in the same fashion as he signed it."

It will be noted from the above that this Act does not require the voter to place his address upon the petition as is normally the case. All he must do is sign in a legible manner. The section of the Act requiring verification reads as follows:

"One or more persons shall verify by affidavit the signatures and addresses of the signers of the petition. The board or boards of registration in the county shall give necessary and appropriate aid to the fiscal court so that the latter body may make the initial, but not conclusive, determination of whether the petition contains enough signatures of qualified voters to suspend the effect of the order or resolution."

Even though the above section does require that the affidavit verify the addresses, along with the signatures, this would seem to be superfluous because the petitioner is not required to place his address upon the petition. Normally the one verifying would not be required to verify anything except that which was placed there by the petitioner. Once the signature of the petitioner is verified, the petition is then submitted to the fiscal court who with the aid of the board of registration can examine it and determine whether the petition contains enough signatures of qualified voters. It would become possible upon this examination to determine if the signers actually resided where the petition indicated and were qualified to vote in that precinct. Once this is determined in the affirmative that would seem to foreclose the question, except for judicial review to determine if the fiscal court had erred in determining whether one or more of the petitioners did not meet the requirements of the Act.

Citing previous judicial opinions upon a question of construction such as this is practically futile as each act permitting initiative or referendum in some respects differs from all other acts. Therefore, the matter boils itself down, in most instances,

to the proposition of attempting to determine exactly what the Act requires. Generally, courts are prone to give a liberal construction to such acts to facilitate their purpose and not to hamper the exercise by the voters of the rights granted thereby. 42 Am.Jur.2d, Initiative and Referendum, § 5, p. 653.

Taking the statute as written and the legal consequences flowing therefrom, it becomes apparent that the petitioners performed every duty imposed upon them. The fiscal court's investigation with the assistance of the registration board revealed the petitions to be accurate as to names and addresses. This was affirmed by the circuit judge and there is no suggestion in the case that the fiscal court or the circuit judge was in any way mistaken as to the validity of the signatures. Every purpose of the Act was met and enforced. The signatures were found to be valid and proper. I think the judgment should be affirmed.

For the foregoing reasons, I respectfully dissent.

NEIKIRK, J., joins in this dissent.