MARIO E. DÁVILA ET AL., Petitioners, *v.* GENERAL SUPERVISOR OF ELECTIONS, Respondent.

No. 519. Submitted July 28, 1960.—Decided August 1, 1960.

258

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.*

On July 20, 1960 the petitioners, acting as organizers and president and provisional secretary of the Christian Action Party, filed a petition for mandamus before this Court, at that time on vacation, invoking our original jurisdiction "due to the urgent nature and great public interest" of the matter. We were asked to issue a writ of mandamus against Ernesto Mieres Calimano, General Supervisor of Elections, ordering him to allow petitioners "to inspect and take out copies of the provisional poll lists of 1956[1] upon payment of the corresponding legal fees."

On the following day, Mr. Chief Justice Negrón Fernández, acting as judge on vacation, issued an order directing the respondent that, "If you have cause for not consenting to plaintiff's request you should present your answer to the petition on or before July 28, 1960, at 10:00 a. m. and the parties are hereby summoned to appear at the corresponding hearing to be held at 2:00 p. m. of that day."

The respondent submitted his answer within the term granted to him. He accepted some of the facts recited in the petition and denied others, he set up two legal defenses and requested that the remedy sought by the petitioners be denied.

On July 28 a hearing was held before the full Court, upon being called for this purpose by the Chief Justice. At the hearing, we received documentary and oral evidence[2]

---

* Editor's Note: This opinion was rendered on March 17, 1961.

[1] The evidence afterwards clarified that the petition referred to the provisional lists of 1960.

[2] Only two persons testified, Eduardo Flores for the petitioners and Ernesto Mieres Calimano for the defendant party.

offered by the parties. They expressly waived their right to submit briefs.

On August 1, after a careful study and thorough discussion of the matter, we rendered the following judgment:

"On the basis of the evidence received and for the reasons that will be timely expressed in an opinion, the Court finds that:

"First: Since the month of November 1959, two copies of the provisional lists of registration of voters for the year 1960 were sent by the General Supervisor of Elections to all the Chairmen of the Local boards of elections. At least one copy of said lists is intended for public use, which necessarily entails the right of any interested person to take out copies of any of them in the offices of said local boards, at reasonable hours, subject to the adoption of adequate measures by the custodian of said lists in order to safeguard them and keep them available to the public. There is nothing in the evidence to the effect that during the first days of the month of June, 1960, date on which the petitioners for the first time requested the Supervisor to issue certified copies of said lists, the same were not available —with the exception of those corresponding to the precincts of Aguadilla, Arecibo, Río Piedras II, San Juan, and Yabucoa— to be inspected and copied by the petitioners, and there is nothing in the evidence indicating that they are not available at present. Consequently, except as regards the precincts already mentioned, the petitioners have at their disposal, and have had since they started the process of registration of their party, and on various occasions have made use of, a simple, speedy and effective means of obtaining copies of the lists in question without the necessity of making use of those which are under the custody of the Supervisor and which the latter frequently uses in the discharge of his official duties.

"Second: The petitioners have a right to be permitted to inspect and copy the provisional lists of registration of voters in 1960 for the electoral precincts of San Juan, Río Piedras II, Arecibo, Aguadilla and Yabucoa. Nevertheless, the petitioners have the obligation to submit themselves to the reasonable vigilance of the General Supervisor of Elections or of his agents or employees in order to guarantee the safety of said documents and to any other reasonable measures which are imposed on

them for the purpose of: (1) avoiding obstacles and difficulties which prevent the Supervisor and the State Board of Elections from complying with the duties imposed on them; and (2) determining the appropriate method, place and hours to inspect and copy the aforesaid documents with reasonable promptness.

"Therefore, the General Supervisor of Elections is hereby ordered to allow the petitioners to inspect and copy the provisional lists of registration of 1960 for the afore-mentioned precincts, subject to the conditions and requisites which are established in the Second Paragraph of this judgment.

"It was so decreed and ordered by the Court as witnesses the signature of the Chief Justice, who dissented for the reasons which he shall also state in due time."

Now we shall explain the grounds on which our judgment is based. First, however, we must make a detailed statement of the pertinent facts which, based on the admissions of the parties and the evidence offered, we consider as proved.

About the 7th and 9th of June, 1960, Mario Dávila and Eduardo Flores, in their capacity as temporary president and secretary of a political group known as the Christian Action Party, had a meeting with Ernesto Mieres Calimano, General Supervisor of Elections of Puerto Rico and asked him for certified copies of the provisional poll lists of 1960, corresponding to nine election precincts. They wished to register the afore-mentioned party so that it could participate in the general elections of 1960 and they needed the afore-mentioned lists in order to have the exact names of the voters who had voted in the past elections, their personal circumstances and the exact place where they had voted. Those facts are indispensable in order to fill out promptly and accurately the registration ballots.

Mieres informed Dávila and Flores that all the precincts had copies of those lists destined for the public use but that there would be no objection in furnishing to them those in which they were interested. The petitioners paid the fees required by law and a few days later the copies were deliv-

ered to them. From that date and until the latter part of June, the petitioners continued to request copies of the lists of other precincts up to an amount which, according to Flores, reached a total of 74 and, according to Mieres, 61. The legal fees were paid although those corresponding to 6 precincts were thereafter withdrawn. Until July 28, date of the hearing before this Court, the petitioners had received from the office of the Supervisor, 39 of the requested lists, there remaining to be delivered, according to Flores, 29 lists. The Supervisor had already informed the petitioners that due to the great amount of work in his office, it would be impossible to deliver all the lists before the term fixed by law—August 28—for submitting to the State Department the sworn petitions of registration.

For said reason, the petitioners conferred with the Supervisor on July 12 and requested to be permitted to inspect and photocopy the lists that they needed. There are some controversies regarding the details of this conference but it is clear that the petition was denied by Mieres on the ground that such an action would create inconveniences in his office and because in his opinion he did not have legal authority to permit it. Nevertheless, he suggested to the petitioners that they take the matter before the State Board of Elections. This suggestion having been accepted, and the petition having been argued, the Board unanimously denied it.

Mieres explained in his testimony before this Court that since the month of November, 1959, his office had sent two copies of the provisional lists of 1960 to the chairmen of the local boards of each of the 80 precincts of the island and that one of those lists is for public use and the other is to be kept in the files. He pointed out, besides, that after the activities of registration of the Christian Action Party had started, he had received five telegrams from the Chairmen of other local boards informing him that the lists in question had been misplaced. He identified such precincts as Aguadilla,

Arecibo, Río Piedras II, San Juan and Yabucoa and explained that as soon as he had received those communications, he had ordered the taking out of copies of the lists of those precincts. Said copies had not yet been delivered to the petitioners.

Although on one occasion during his testimony Flores said that in "very many courts"[3] there were no lists, he afterwards accepted that only the aforesaid precincts had notified him, through the chairmen of the local boards or through the members of his party, that the lists had been misplaced. He added the precinct of Guaynabo but later explained that he had been informed by the office of the Supervisor that the list of that precinct was available. Also on some occasions he mentioned Bayamón, but at the end he informed that the lists of 1956 of that precinct had been delivered to him.

It was also stated by Flores that the party was being registered in more than 70 precincts and that "old lists or those of 1960" were being used.

Mieres also explained, that since the month of May, 1960, his office had been preparing the final voting lists for the general elections of 1960, and that the law imposes the duty of submitting those lists to the Board on or before September 1. In his office there is only one copy of the provisional lists of 1960, which must be used continually in preparing the final lists. Also in his capacity as Director of the Party Primary he has access to another copy of the provisional lists. That copy is used for the activities of the Institute[4]

---

[3] The lists are generally kept in the courts because the justices of the peace and the district judges are the chairmen of the local boards of elections.

[4] Section 74 of Act No. 62 of June 19, 1956, (16 L.P.R.A. § 1165) provides that: "Primaries shall be held not later than the last Sunday of July of the year in which a general election is to be held." Therefore, and according to the statement of Mieres, after July 31, the Institute did not have a great need of using the copy of the provisional lists of 1960 which it possessed.

and it is also delivered to the State Department to be tallied with the registration ballots.

The procedure for preparing certified copies of the lists requested by the petitioners is slow and requires much care. As an adequate equipment of photocopy does not exist in the office of the Supervisor, it is necessary to (1) assemble the cards of the voters corresponding to each precinct, (2) "make out" the list in an electronic machine using the cards, (3) to tally the copy with the original list to make sure that it is correct, (4) to fasten the copy with a stapler and (5) to certify it and affix to it the internal revenue stamps required by law. The Supervisor has at his disposal only two electronic machines which he also uses continually to prepare the final lists. He does not have any employees especially assigned to the task of preparing the copies but he has to make special assignments for that purpose. His personnel, although numerous, is constantly busy with the enormous and delicate task of preparing all matters concerning the forthcoming general elections. Inadequate space is provided for his necessities and a great number of employees must work in the corridors of a section of the state Capitol, which has been properly isolated to avoid extraneous intervention.[5]

Mieres also stated that after consulting his files, he could affirm that no party had ever been registered in Puerto Rico

[5] Flores stated that on one occasion he had informed the Supervisor of his willingness to accept copies of the final voting lists of 1956 instead of the provisional ones of 1960, but that after that conversation, the lists of only two precincts had been delivered to him. Mieres stated that the process of taking out copies of the lists of 1956 also requires time and care. It is necessary to open the envelopes of each polling place of the precinct, verify if there are copies of the lists without notes in them, and if there are none, which happens in the great majority of cases, it is necessary then to use the same process which he explained regarding the provisional lists.

Both parties agreed that the lists of 1956, although of some use, were not adequate substitutes of the provisional ones of 1960 because around 25% of the names included in them were persons who had not voted and consequently, did not have a right to swear to petitions of registration of a party, unless they had been registered again as voters.

through the purchase of lists in the Office of the Supervisor, but that all of them had done it by copying the pertinent facts from the lists that were in the possession of the chairmen of the local boards.

We should conclude, in the light of the evidence received, that: first, since the beginning of the activities of registration of the Christian Action Party in the first days of June of this year, the petitioners have had at their disposal, and continue to have, and on various occasions have used for inspection and copy thereof, the provisional voting lists of 1960 in the office of the local boards of elections of all the electoral precincts of the island except those of Aguadilla, Arecibo, Río Piedras II, San Juan and Yabucoa; second, those lists do not exist in the afore-mentioned precincts because they have been misplaced; third, at the time of the hearing of this case the Supervisor had not been able to deliver to the petitioners the copies of the lists of the afore-mentioned precincts, although he had already ordered their preparation; fourth, the General Supervisor of Elections has in his custody two copies of said lists, which he uses frequently in the discharge of his official duties as Supervisor and as Director of the Party of Primary; fifth, since the month of May of this year the personnel of the Office of the Supervisor has been very busy in the preparation of whatever is necessary for the holding of the general elections of 1960, including the final voting lists, which must be submitted to the State Board of Elections on or before the following September 1; sixth, the Supervisor has diligently and reliably complied with his duty of providing certified copies of the lists requested by the petitioners and in scarcely seven weeks he has delivered to them those corresponding to 39 precincts; seventh, said copies could not have been prepared more promptly for the sole reason that equipment and personnel were lacking and because of the enormous amount of work with which the Office of the Supervisor is burdened; eighth,

the Supervisor can not, by means of certification, deliver to the petitioners all the lists in which they are interested before August 28, 1960, date on which the term to submit petitions for registration expires; ninth, since July 12 of this year and aware of the situation described, the petitioners requested the Supervisor to be permitted to inspect and photocopy the lists corresponding to 29 precincts; tenth, the Supervisor denied the request because he believed he had no legal authority to do so and because he was afraid that the work in his office would be impaired; and eleventh, the provisional lists of 1960 are very necessary in order to attain a prompt and accurate registration of any new political party which is interested in participating in the forthcoming general elections.

We shall initially expound various essential considerations which, although not debatable in this case, must necessarily be set forth in order to properly situate the real controversy. First: Mandamus is the appropriate remedy in this litigation because there is no other adequate legal remedy available to petitioners and because it has to do with the nonperformance of a duty allegedly imposed by law. *Prensa Insular de Puerto Rico v. Cordero, Auditor*, 67 P.R.R. 83 (1947); *Espina v. Calderón, Judge*, 75 P.R.R. 71, 79 (1953); *Enforceability by mandamus of right to inspect public records*, 169 A.L.R. 653 (1947). Second: The original jurisdiction of this Court has been correctly invoked, since the petition is directed to one of the high officers of the Government, the issues involved are of great public interest, and the problem raised requires a prompt and final decision. *Partido Popular v. Gallardo*, 56 P.R.R. 677, 681 (1940). Third: The petitioners have alleged and proved that they asked the Supervisor to act in the manner sought to be ordered. *Suárez v. District Court*, 65 P.R.R. 799, 806 (1946); *Espina v. Calderón, Judge, supra* at 76. Fourth: The petitioners unmistakably have a "special interest, different from the general

interest possessed by any citizen in the right claimed." *Prensa Insular de P. R.* v. *Cordero, Auditor*, supra at 94. Their desire to inspect and copy the provisional lists of voters of 1940 does not arise from mere curiosity or from a desire to impair the work of an official organization, but rather it flows from their responsibilities as organizers and directors of a political party in the process of registration and is based, consequently, on the fundamental right of selection of candidates and of electoral organizations fully protected by the Constitution and the local laws and which constitutes one of the basic guarantees of a democratic government.

Having laid down these premises, we proceed to analyze the two questions raised in this proceeding. They are as follows: Has the General Supervisor of Elections the duty to permit the petitioners to inspect and copy the provisional lists of voters of 1960 which are in his custody? If so, what should be the scope and content of our order? The answer to the first question depends upon the interpretation of the applicable legal provisions, and that of the second, on the specific circumstances which should move our informed discretion.

I

Section 27 of the existing Election Law (Act No. 87 of June 20, 1955, Sess. Laws, p. 348, 16 L.P.R.A. § 750) provides in its initial paragraph that "In accordance with the provisions hereinafter set forth, the General Supervisor of Elections shall cause the following lists to be prepared: (a) provisional registration lists, (b) lists of the voters registered in the election year, and (c) registration transfer lists." Then paragraphs (*a*), (*b*) and (*c*) describe in detail the context of each one of the lists[6] and the methods which the Supervisor should use to prepare them. It then adds:

---

[6] For the purposes of the general elections following the year 1956, the "provisional registration lists," shall be "the lists of voters who voted in the immediately preceding general elections."

"The General Supervisor of Elections shall send by registered mail or by special messenger two copies of all the lists referred to in this section under letters (b) and (c) to the chairman of the local board of elections of the respective election precinct to which they appertain; one copy to the chairman of each political party; one copy to the representation of each political party in the Commonwealth Board of Elections, and one copy to the Chairman of the local committee of each of the principal **parties and parties** by petition in said precinct, and another copy shall be kept in the files of the Commonwealth Board of Elections. Immediately after receiving his two copies, the chairman of each local board of elections shall post one copy to the public in a conspicuous, accessible and protected place at the entrance to the offices of the local board of elections, and shall keep the other copy in the files of said board.

"The General Supervisor of Elections shall send the 'lists of voters registered in the election year', on or before April 15 of the year in which elections are to be held, and shall send the two 'Registration Transfer Lists' on or before December 15 of the year preceding that in which elections are to be held.

"The General Supervisor of Elections may issue certified copies of said lists upon payment of one cent for each name, in internal-revenue stamps which he shall affix to and cancel on such lists.

"Any person who voluntarily and maliciously takes down or spoils any of the said election lists posted to the public shall be guilty of a felony and shall, upon conviction thereof, be punished by imprisonment in the Penitentiary for a term of not less than six (6) months.

"The General Supervisor of Elections shall prepare the printed forms necessary for the registration transfers referred to in the preceding clause (c) and shall sell same at the price fixed by the Commonwealth Board of Elections.

"Both the lists referred to in this section and all the other lists provided herein, as well as the notice cards to the voters, may be prepared by mechanical means through the use of the necessary machines to that effect."

The last paragraph establishes certain proceedings which exclusively affect the request of registration tranfers included in the aforesaid paragraph (c).

From a mere reading of these provisions it may be observed that the Legislative Assembly did not expressly provide in § 27 a method for distributing and giving publicity to "the provisional registration lists" described in paragraph (*a*) but that it did so regarding the lists included in paragraphs (*b*) and (*c*). Neither is there any provision whatsoever in the rest of the statutes in force concerning the electoral procedure which covers the provisional lists in the above-mentioned aspect.

This, however, was not always the case. Until the year 1950, § 27 ordered the distribution and publicity of "all the lists referred to" therein instead of only the lists referred to under letters (*b*) and (*c*). Act No. 384 of May 11, 1950 (Sess. Laws, pp. 882, 888). Nevertheless, when § 27 was amended on the following year (Act No. 7 of September 27, 1951, (Sp. Sess. Laws, pp. 114, 118) paragraph (*a*) was modified so that instead of containing, as before, a general explanation as to what constituted "provisional registration lists", it specifically mentioned under that name and for the general elections of 1952, the lists of voters that would be used in the Referendum on the Constitution of 1952, as provided by the corresponding laws. It then became unnecessary to establish methods of distribution and publicity for said provisional lists because it had already been provided by the Referendum Act. Sections 36 and 37 of Act No. 27 of August 30, 1950 (Sp. Sess. Laws, pp. 98, 134–140). For that reason only paragraphs (*b*) and (*c*) were mentioned. See also Act No. 4 of February 9, 1952 (Sp. Sess. Laws, pp. 192, 194).

However, when paragraph (*a*) of § 27 was amended again in 1955 to include once more a general definition of the term "provisional registration lists" and to eliminate the now useless reference to the laws on the 1952 Referendum, because of an omission which was obviously involuntary, the paragraph concerning distribution and publicity was not

amended in order to reincorporate therein the reference to paragraph (*a*). As a result, there is no provision at present, as we previously indicated, that expressly covers these matters regarding the "provisional registration lists" while there are those that cover the other two lists described in § 27.

This explanation is necessary in order to clarify the legal situation. We believe, however, that the afore-mentioned omission in no way eliminates or modifies the nature of public document attached to the "provisional registration lists." Section 27 as well as other provisions of the election laws[7] ratify the public character attached to those lists and the urgent need that they be available to be inspected and copied by those persons who desire to do so. Likewise, the Supervisor has acted as if the reference to paragraph (*a*) still existed in the law in force and he has distributed the copies of the provisional registration lists of 1960 as provided by § 27 regarding the distribution of the other two lists. As we know, since November 1959 he sent two copies of these lists to the offices of the local boards of elections where, except for the five precincts mentioned in this opinion, they have been available to the petitioners and to the public.

In addition to the above-cited provisions of the election laws, we should consider §§ 409 and 410 of the Code of Civil Procedure (32 L.P.R.A. §§ 1781 and 1782) on which the petitioners chiefly rely:

"Sec. 409: Every citizen has a right to inspect and take a copy of any public document of Puerto Rico, except as otherwise expressly provided by law.

"Sec. 410: Every public officer having the custody of a public document is bound to give him, on demand, a certified copy of it on payment of the legal fees therefor, and such copy is admissible as evidence in like cases and with like effects as the original writing."

---

[7] Examine as examples, §§ 41, 71, 76–79, 81, 112 and 215 which provide rights and procedures which can not be used without the interested party having access to the provisional registration lists.

We made an extensive study of these sections in *Prensa Insular de Puerto Rico* v. *Cordero, Auditor*, 67 P.R.R. 83 (1947),[8] opinion delivered by Mr. Justice De Jesús. It is unnecessary to repeat what we explained therein. It is sufficient to remember two fundamental rules we established, in addition to that of the special interest of the petitioners already explained in this opinion. (1) "The duty to permit the inspection of documents exists as a duty correlative to the right to inspect granted by § 409 of the Code of Civil Procedure and impliedly arises out of the duty to issue certified copies of said documents upon the payment of the corresponding fees." (2) "In order that the right to inspect documents may be enforced by mandamus it is not necessary that the duty to permit the inspection be expressly imposed by law as an obligation appertaining to an office. The mere existence of the right to inspection *ipso facto* gives rise to the duty impliedly imposed by § 409 of the Code of Civil Procedure to permit the inspection."

In the above-cited judgment the problem was exclusively treated with regard to the right of inspection because the petition for mandamus was limited to that right. It is evident nevertheless, and there is no need for analysis, that the same rules are applicable to the right to "take copies" which is expressly guaranteed by § 409. The custodians of public documents in Puerto Rico, therefore, have the duty to permit interested persons to inspect and copy those documents, even though the corresponding law does not expressly impose that duty.

Although the respondent does not deny the public character of the election lists, however he states, that the above-cited §§ 409 and 410 are not applicable to the controversy now before us. He maintains that these are "provisions of a general nature which should yield to the special provisions

---

[8] Affirmed in *De J. Cordero* v. *Prensa Insular de Puerto Rico*, 169 F.2d 229 (1 Cir. 1948).

of § 27 of the Election Law" and that we should apply "the well-known principle that a special law on a particular matter should prevail over any other applicable provision of a general nature."

In *Banco de Ponce* v. *Secretary of the Treasury*, 81 P.R.R. 432, 439–440 (1959) we explained that "We can not interpret the laws only through the mechanical application of the very stale canons of construction. The latter are no other than 'generalization of experience' . . . and, as such, subject in their application to the limitations that each concrete situation provides." See Silving, *In the Nature of a Compact— A Note on Statutory Interpretation*, 20 Revista del Colegio de Abogados de Puerto Rico, 159, 167–168 (1960).

Although § 409 is a provision of a general nature, good care was taken when drafting the same to establish with absolute clearness the circumstance that would render it inoperative. The right of the citizen to inspect and copy any public document is guaranteed "except as otherwise expressly provided by Law." This severe restriction is fully justified because § 409 is the most effective legal means in our government to protect the right of the citizen to be informed about the conduct of its affairs. Identical or similar versions designed for that purpose exist in a great number of the States of the Union. Cross, *The People's Right to Know* (1953), especially pp. 19, 34, 50–55 and 337–347; Pickerell, *Secrecy and the Access to Administrative Records*, 44 Cal. L. Rev. 305 (1956); Thayer, *Legal Control of the Press* (1956) pp. 162–178; 16 Cal. Jur. 2d 122–126. And such a laudable purpose should be coupled with a meticulous judicial interpretation to insure full effects and thereby guarantee to the interested persons the opportunity to inspect and copy public expressions of the official conduct of affairs.[9] In order to decide that

---

[9] "It is not enough merely to recognize the important political justification for freedom of information. Citizens of a self-governing society must possess the *legal* right to examine and investigate the conduct of its

§ 409 is not applicable to a particular type of public document, the least we can do is to require a clear and final order from the Legislative Assembly. If we adopted the opposite position we would have to accept that every time the Legislature provides for a method of publicity, regardless of how inadequate it may be in general terms or in terms of the particular circumstances of each case, such action excludes by itself § 409, although the latter, to be inapplicable, requires, by its language, an express legislative order to that effect, and by its purpose, a social interest superior to the basic interest which it is designed to protect.

On numerous occasions the Legislature has explicitly ordered that certain documents shall be of a confidential character, or has specifically mentioned the persons who may inspect and copy them or the occasions when such acts are appropriate.[10]   There is not the slightest indication in § 27 of the Election Law—without taking into consideration the omission in the 1955 Act, already explained—that it intended to make § 409 inapplicable to the lists mentioned in that section or that the method of publicity thereby created would be exclusive, regardless of whether the surrounding circum-

---

affairs, subject only to those limitations imposed by the most urgent public necessity. This right must be elevated to a position of highest sanctity if it is to constitute an effective bulwark against unresponsive leadership." (Emphasis in the original.)   *Access to Official Information: A Neglected Constitutional Right,* 27 Ind. L. J. 209, 212 (1952).

[10] See the following examples: 4 L.P.R.A. § 615—the information obtained by the Parole Board shall be confidential and shall not be disclosed in any manner except to certain officers; 8 L.P.R.A. § 24—establishes the confidential nature of the documents, records, papers, files and communications of the Division of Public Welfare; 13 L.P.R.A. § 3055—creates a special procedure to inspect and copy the income tax returns; 16 L.P.R.A. § 1047—forbids the Director of the Party Primary to disclose any information whatsoever with regard to the facts set forth in the Registries of a given party to the central or local bodies or to the candidates of other parties, or to the public; 24 L.P.R.A. § 974(y)—establishes the confidential character of the records and other documents rendered by virtue of the Narcotics Act and special rules for its inspection and divulgation; 29 L.P.R.A. § 388—creates a special regulation concerning the registries and other documents required by the "Industrial Homework

stances would in effect lead to the failure of such a method. On the contrary, it appears from that section as well as from others, already cited, of the election laws, that there exists a genuine legislative concern for a greater dissemination of these lists and to see that they reach the hands of those who shall be in need of them for the proper exercise of their political rights. In the absence of a clear and specific expression we cannot attribute to the lawmakers, who have more than once shown their skill in framing a clean, impartial, and honest electoral system,[11] the intent to create a unique

method of publicity, always applicable, regardless of its flaws in practice, for lists which constitute the core of the registration process.

We, therefore, decide that § 409 is applicable to the provisional lists of registration described in § 27 of the Election Law, and that the General Supervisor of Elections, as custodian of those lists, has the legal duty to permit the petitioners to inspect and copy them.

---

Act"; 32 L.P.R.A. § 2696—provides that documents regarding adoption and filed with the corresponding Court, as well as the judgment and orders of the Court, shall not be subject to inspection except by certain persons; 34 L.P.R.A. § 2007(f)—the records of delinquent children cases shall not be subject to public inspection. As to the latter, see also 34 L.P.R.A. App. R. 7.2, R. 11.2, R. 11.3, R. 13.2. As to the states, see Cross, op. cit., pp 84–94. In nowise it should be understood that in citing the afore-mentioned examples we are deciding that §§ 409 and 410 do not have any application whatsoever in those cases. Such a determination shall require an analysis of each legal situation and its attendant circumstances. We are simply giving examples of specific legal restrictions of the right to inspect and copy in order to establish the contrast with § 27 of the Election Law, in which these restrictions do not appear.

[11] See the Report of the Governor's Committee for the Study of the Civil Rights in Puerto Rico (Ed. Colegio de Abogados de Puerto Rico, 1959) pp. 61–78, and specifically p. 63, where it is stated that: "The functioning of the democratic processes is within the limits of the Commonwealth most satisfactory insofar as universal suffrage is guaranteed, without discrimination; elections are peaceful, orderly, honest and free; and the margin for free expression and association for the electoral campaigns is sufficient," and it adds that the faults found therein "are relative and conspicuous because of the interest we have of being strict in pursuit of the highest possible grade of Puerto Rican democracy."

## II

In order for a writ of mandamus to issue, however, it is not sufficient for the petitioner to have a clear right to what he requests and that the respondent have the corresponding duty to permit the exercise of that right. It is a "high prerogative" writ, as stated in the law creating the same, 32 L.P.R.A. § 3421, and the courts must necessarily weigh all the attendant circumstances in determining whether or not the writ should issue, as well as in fixing the context of the order, once the initial question is affirmatively decided. In other words, the remedy is not granted *ex debito justitiae* and as soon as the right of the petitioner is acknowledged, but only when the court is convinced that purposes of social and individual utility shall be complied with. To those ends, it is indispensable to calculate what shall be the effects of the order on the proper performance of the responsibilities of the officer affected thereby and up to what point it shall benefit the petitioner. In short, we must necessarily establish the most perfect equilibrium possible between the different conflicting interests.[12]

In the particular situation of the controversy before us, there is no doubt that the office of the General Supervisor of Elections is, at least since May of this year, under great pressure because of its enormous task of preparing everything concerning the forthcoming general elections. There are inexorable terms fixed by our Constitution as well as by our statutes, to which he must conform his official work. The public interest in that those elections be carried out dutifully and pursuant to the pertinent legal provisions, cannot yield to any other interest and this Court must necessarily abstain from issuing orders that might jeopardize it. Although in this litigation there is, as we have already said,

---

[12] See *Maisonave* v. *Domenech*, 45 P.R.R. 238, 242–243 (1933); *Ortiz* v. *Muñoz*, 19 P.R.R. 809, 815 (1913); *State* v. *Knop*, 190 So. 135. 146–148 (La. 1939).

a special interest which flows from one of the fundamental political rights, it is of elementary justice to establish that neither the Supervisor nor the other public authorities has any responsibility whatsoever by reason of the fact that the petitioners, whatever their motives, started the registration of their party scarcely three months prior to the expiration date. and on that account and in order to comply with the statutory requirements,[13] were forced to act under heavy pressure.

On the other hand, the evidence conclusively showed that ever since the petitioners started their activity of registration, they have had at their disposal and continue to have, in all except five of the election precincts, copies of the provisional registration lists in which they are interested. They may and have been able to inspect them and take copies without any difficulty, subject only to a reasonable vigilance of the custodians of the lists, in order to protect their safety and public availability.

For the reasons already explained, we shall not grant the request of the petitioners that the Supervisor permit them to inspect and take out copies of the lists corresponding to the 29 precincts of which certified copies have not been delivered to them. That order would not only be unnecessary regarding 24 of those precincts but it could cause great difficulties in the election preliminaries. We shall limit our order only to the precincts of Aguadilla, Arecibo, Río Piedras II, San Juan and Yabucoa, where it has been impossible for the petitioners to use the lists sent to the chairmen of the local

---

[13] The Election Law requires that a party by petition registers candidates by petition in and for three fourths or more of the election precincts throughout the country and that it file in the State Department, petitions signed by a number of petitioners equivalent to 10% or more of the total number of votes cast in the preceding general elections for the office of Governor, 16 L.P.R.A. §§ 20 and 112. The total number of votes for the office of Governor in the elections of 1956 was 696,574. State Board of Elections, *Statistics of the General Elections Held in P. R.* on Nov. 6, 1956 (1957).

boards, because the same have been misplaced. We are fully confident that the Supervisor, according to the terms of our order, shall establish an adequate regulation in order to permit petitioners to inspect and copy the aforesaid lists with reasonable promptness, and his office to continue unhindered its work for the general elections.[14] *Prensa Insular de Puerto Rico* v. *Cordero, supra* at 96; *Marsh* v. *Sanders*, 34 So. 752, 754–755 (La. 1903) ; *Higgins* v. *Lockwood*, 64 Atl. 184, 186 (N. J. 1906) ; *Kennedy* v. *Skeen*, 186 S. E. 926, 927 (Va. 1935) ; *State* v. *Knop, supra* at 144–145.

Mr. Chief Justice Negrón Fernández, dissenting.

Section 4 of Article VI of the Constitution of the Commonwealth of Puerto Rico, in its third paragraph provides that "All matters concerning the electoral process, registration of voters, political parties and candidates shall be determined by law."[1]

Subject to the other constitutional provisions which serve as a basis or are related to the matter,[2] the foregoing provision supposes a legislative plan designed to regulate all matters concerning the exercise of the right to vote as an essential process of democracy.

---

[14] On one occasion during his testimony before this Court, the Supervisor expressed his view that up to three persons could be permitted to do the photocopy of the lists, without hindering the functions of his office.

[1] Other provisions contained in said § 4 are:

"General elections shall be held every four years on the day of November determined by the Legislative Assembly. In said elections there shall be elected a Governor, the members of the Legislative Assembly, and the other officials whose election on that date is provided by law.

"Every person over twenty-one years of age shall be entitled to vote if he fulfills the other conditions determined by law. No person shall be deprived of the right to vote because he does not know how to read or write or does not own property.

" .           .           .           .           .           .           .           .

"Every popularly elected official shall be elected by direct vote and any candidate who receives more votes than any other candidate for the same office shall be declared elected."

[2] Art. II, § 2; Art. III, §§ 4 and 7; Art. VIII, §§ 1 and 2; Art. IX, § 6.

This juridical order is represented by the following laws: Election Law,[3] Registration Act,[4] Act to Provide the Procedure for Contesting the Election of Officers Other than Members of the Legislature and the Resident Commissioner,[5] Law on Special Elections to Fill Vacancies in the Legislative Assembly,[6] Primary Act,[7] Election Fund Act for Political Parties,[8] and by those provisions of the Penal Code relative to crimes against the right to vote, publication of which the Election Law itself orders to be included as a supplement annexed to the same,[9] and of the Political Code which requires a candidate elected to office to meet the conditions required to be an elector,[10] besides the Rules and Regulations on electoral matters promulgated according to law.

It was precisely for the purpose of regulating in an orderly manner the right of a citizen to obtain copies of the lists of voters, that the following provision was included in § 27 of the Election Law, 16 L.P.R.A. § 75: "The General Supervisor of Elections may issue certified copies of said lists upon payment of one cent for each name, in internal-revenue stamps which he shall affix to and cancel [11] on such

---

[3] Act No. 79 of June 25, 1919, as amended. 16 L.P.R.A. § 1 *et seq.*
[4] Act No. 19 of June 10, 1939, as amended. 16 L.P.R.A. § 351 *et seq.*
[5] Act No. 72 of May 4, 1931, as amended. 16 L.P.R.A. § 401 *et seq.*
[6] Act No. 20 of August 22, 1952, as amended. 16 L.P.R.A. § 441 *et seq.*
[7] Act No. 62 of June 19, 1956, as amended. 16 L.P.R.A. § 1001 *et seq.*
[8] Act No. 110 of June 30, 1957, as amended. 16 L.P.R.A. § 601 *et seq.*
[9] "§ 98.—The General Supervisor of Elections shall make copies of all penalties established for the various cases in this subtitle, as well as those comprised in the Penal Code, relative to election cases, and shall print them as a document annexed to this subtitle. He shall likewise give the publicity possible to said penalties, sufficiently in advance in every city and town in the Commonwealth, in all years in which elections are to be held." 16 L.P.R.A. § 521.
[10] Section 183, Political Code. 16 L.P.R.A. § 521.
[11] The omission to reincorporate in § 27 of the Election Law, in amendments subsequent to that of September 27, 1951, the reference to paragraph (a) of the same about "provisional registration lists" as it is correctly stated in the opinion of the Court, does not alter the public character of said lists. The requisite of distribution and publicity thereof, which always constituted part of the legislative plan for the development of the electoral process, continues to be in effect by operation of the process

lists." A similar provision was included in § 35, 16 L.P.R.A. § 85,[12] in relation to the lists of the polls of each electoral precinct, that is, the final lists of voters for the general elections, as well as in § 3 of the Special Elections Law to fill vacancies in the Legislative Assembly, 16 L.P.R.A., § 443,[13] in relation to the lists of voters to be used in the special election.

The legislative intent emerges, in my opinion, with evident clearness in the sense that in order to obtain a copy of the election lists, citizens should adhere to the provisions prescribed by the judicial order which regulates the election process in all its phases, since it is legislation especially directed towards that end, according to constitutional mandate, there being no room in that judicial order for legislation of a general character with which the legislator did not intend to regulate any phase of this process whatsoever. Under the legislative plan thus integrated, it is not necessary to require the Legislative Assembly—which through that special legislation determines that "all matters concerning the electoral process, registration of voters, political parties and candidates," as the Constitution orders—to pronounce "a clear and final order" in the sense that § 409[14] of the Code of Civil Procedure is not applicable to the election lists. We

---

itself and the inherent necessity of the system itself. In this manner it has continued to be understood by the General Supervisor of Elections as he has continued to remit said lists, equally and with the same ends as the others expressly mentioned in § 27 of the Law, to the public officials and organisms provided thereby.

[12] ". . . *Provided*, that any person may secure a certified copy of any of said lists upon payment of one cent, in internal-revenue stamps, for each voter's name contained therein, which stamps shall be duly affixed to said list and cancelled by the General Supervisor of Elections."

[13] ". . . any person may obtain copy of said voting lists upon payment of one cent in internal-revenue stamps for each voter's name contained therein, which stamps shall be cancelled by the General Supervisor of Elections."

[14] Section 409: "Every citizen has a right to inspect and take a copy of any public document of Puerto Rico, except as otherwise expressly provided by law."

are not dealing here with an omission of the Election Law for having neglected to provide specifically—as does § 409—that citizens and voters shall have a right "to inspect and take a copy" of the election lists in the possession of the Supervisor. No. It is a matter of a special law which regulates a special matter and which says how to obtain copies of those lists which the Supervisor has in his possession. It is not that the Legislative Assembly strips said lists of the public character of which they partake by operation of the electoral process of which they are a part, and which is ratified by the very provision of how to obtain copies thereof. What the Legislative Assembly did was to express the public policy, with respect to this kind of public document, and did not deem it wise to open the offices of the Supervisor or those of the State Board of Elections to any person for inspection and taking of copies which were otherwise made manifestly public by the Act.

The fact that the Legislative Assembly substantially incorporated into § 27 of the Election Law, as part of the juridical order on this special matter, the provision of § 410 [15] of the Code of Civil Procedure and did not adopt those of § 409 of the same legal body, proves the legislative purpose of not making the provisions of the latter Code applicable to the election lists, without failing to offer to the citizen, nevertheless, a reasonable opportunity to obtain said lists through the provisions of § 27. The Legislative Assembly was not obliged to include in the Election Law a contradictory expression to the provisions of § 409, since the latter was excluded from the sphere of said legislation by virtue of the regulation itself established for all the stages of the electoral process.

The fact that on numerous occasions it has been pro-

---

[15] Section 410: "Every public officer having the custody of a public document is bound to give him, on demand, a certified copy of it on payment of the legal fees therefor, and such copy is admissible as evidence in like cases and with like effect as the original writing."

vided legislatively that certain documents are of a confidential character, as illustrated in n.10 of the opinion of the court,[16] does not affect the theory I have expounded. What the Legislative Assembly did here—and could do—in the reasonable exercise of its police power on all matters concerning the electoral process, was to establish the system of publication of the lists, for information of the people and to determine the manner in which any person could obtain copies thereof from the Supervisor, which is very far from sanctioning the effectiveness of § 409 within the scope of that special regulation, without being able to invoke the same to protect a right which said regulation did not intend to recognize, nor to compel the Legislative Assembly to follow a specific norm in its technique of the legislation because of the fact that the only exception made by a former Legislative Assembly in § 47 of the Law of Evidence (which is § 409 of the Code of Civil Procedure), when providing for the right of inspection and of taking copies of public documents, was "as otherwise expressly provided by law."

It is not necessary to consider here whether the Legislative Assembly, by virtue of the provisions of § 27, which acknowledges the right to obtain certified copies of the election lists, incorporated into the Election Law the right of inspection which this Court, upon deciding the case of *Prensa Insular de Puerto Rico* v. *Auditor*, 67 P.R.R. 83, affirmed

---

[16] The provision of § 18 of the Primary Act, 16 L.P.R.A. § 1047, in the sense that "the Director shall not disclose any information whatsoever with regard to the facts set forth in the Registries of a given party neither to the central or local bodies or to the candidates of other parties, nor to the public" but that he "may on request of the central directing body of a party or of the representative of the candidacy of that party, certify as to whether the name of a candidate of said party appears or has appeared included in the Registry of another party," far from being a sign that the Legislative Assembly in election matter followed the policy on the technique of legislation which is inferred from § 409, constitutes an undisputable demonstration that the regulation of "all matters concerning the electoral process, registration of voters, political parties and candidates" must be sought in special laws which integrate the legislative plan on that matter and not in outside general provisions.

in 169 F.2d 229, proclaimed as implied in the provisions of § 410 of the Code of Civil Procedure.

The nature of the documents involved herein—election lists—the contents and publication of which are established by law, irrespective of the purposes for which they were sought, renders applicable to this case the underlying principle of the case of Prensa Insular, where this Court laid down the theory of the implied right to an inspection to obtain the necessary knowledge of the contents of a document in order to be in a position to ask for a certified copy thereof. It is clear that in this case, in which a mass petition for electoral lists was made regardless of their content, the right to inspection does not come into play nor is there included the cardinal rule underlying the right of every citizen to be informed of the steps and actions of its government, which have already been made public, thereby acknowledging the very essence of the democratic system.

## II

The only administrative duty of the Supervisor regarding the right of the petitioner to obtain copies of the electoral lists, which duty appears to be necessarily imposed by implication from the legislative plan which regulates all matters concerning the electoral process, was that of delivering certified copies of the lists requested in the manner provided by § 27 of the Election Law.[17]

The Supervisor never refused to deliver the certified copies of the 68 precincts which according to petitioner Flo-

---

[17] Although the language of § 27 of the Election Law is to the effect that the Supervisor "may" issue certified copies of said lists, instead of "is bound to" as stated in § 410 of the Code of Civil Procedure, the term "may," by the public nature of the right involved and by the evident purpose of the statute, imposes on the Supervisor an affirmative *duty* to be executed. The cases of *O'Connel* v. *City of Cambridge*, 154 N. E. 760; *Rich* v. *Board of State Canvassers*, 59 N. W. 181; *Korb* v. *Fox*, 9 S.W.2d 298; *Smith* v. *Curtiss*, 223 S.W.2d 712; *Whitfield* v. *Grimes*, 294 N. W. 346, illustrate the principle of statutory interpretation which justifies this assertion.

res, he had requested from him, although he did inform them clearly that he could not, by August 28—for justified reasons of lack of time to reproduce them, which were not contradicted in the evidence—deliver to them *all* of the 68 lists concerned, of which he had already delivered 39 by July 28 (in 32 working days since June 9, in which they requested the first 6 lists).

The petitioners made no attempt to show—and certainly the evidence in the record proves that they could not—that the Supervisor neglected the duty of delivering certified copies of all the lists before August 28, without the risk of affecting the normal procedure of the general elections of the following November 8. And there is nothing in the evidence to show that after they learned that the provisional lists of voters of 1960 did not appear in the precincts of Aguadilla, Arecibo, Río Piedras II, San Juan, and Yabucoa, they requested said officer to prepare and certify, in advance of all the others, the lists of the five precincts mentioned above. On the contrary, they were interested in the certified copies of *all* the 68 precincts, despite the fact of having already been informed that *not* all the lists could be delivered before August 28.

The purpose of requesting the lists of 68 precincts which was described by petitioner Flores in terms of the *necessity* of obtaining the exact data regarding the name, age, color, year, and ward in which the voter who was going to sign the petition for registration was registered (p. 10 Sten. Rec.) is translated into terms of *comfort* when, upon explaining that after having received the lists of 39 precincts there were still missing those of 29 precincts, he stated:

"We have the lists in the thirty-nine (precincts). Now there is a problem, the problem is that it is too slow a process. Because people have to go to court, and search there for that name with difficulty, there is no space in the court to type comfortably, there is no typewriter and we need the lists in our office because then we may fill out the information comfortably

and correctly under efficient conditions and we do not run the risk of copying incorrectly under the conditions existing in the courts." (P. 29 Sten. Rec.)

We should not forget the following words of the Supervisor when testifying before this Court:

". . . in the search I have made I find no political party in Puerto Rico which has ever been registered by the purchase of lists. All the political parties in Puerto Rico have been registered through the pres . . . of the State Boards who have copied the lists that we provide. This is the only party that has ever requested the purchase of lists." (P. 14, Sten. Rec.)

If we consider that the first request made to the Supervisor for the certified copies of the lists sought by petitioners (in 68 precincts, as Mr. Flores stated) was made on June 9, 1960 (that is, 53 working days before the final term established by law to present in the State Department the petitions for the inscription of a political party), we may gather that the unusual request of the petitioners imposed on the Supervisor, because of the time limitation, an unusual working pressure and one which had never before been confronted by a General Supervisor of Elections in the administration of the Election Law.

The history of the development of the registration of parties by petition in Puerto Rico, as it has been transcribed above, fully justified and does not render it unreasonable or arbitrary, the public policy established by the Legislative Assembly in relation to the form and manner of obtaining copies of electoral lists, that is, pursuant to § 27 of the Election Law, and not pursuant to § 409 of the Code of Civil Procedure.

The court granted the petition for mandamus as to five of the twenty-nine precincts, the certified lists of which had not yet been delivered by the Supervisor at the time of the hearing of the appeal, and denied it as to the rest of the said precincts on the ground that, in relation to the latter, the

petitioners had the lists in which they were interested within their reach at the Local Boards of Elections where they could inspect them and, take copies thereof, while regarding the first five, said lists were not in the possession of the local Boards and, therefore, the petitioners did not have access to them in the respective precincts. I should infer that if the aforesaid lists had been available at the Local Boards of all of the 29 precincts, the court would have denied the petition for mandamus altogether.

If this appreciation is correct, my theory that the mandamus in this case did not lie even regarding the five precincts in question—because the Supervisor did not have any administrative duty whatever to comply regarding the right invoked by the petitioners, other than that of issuing certified copies of said lists as he had been doing—is buttressed by the determination of the court itself. If the petitioners had the right to inspect and photocopy the lists in the possession of the Supervisor, corresponding to the five precincts concerned, they had the same right to inspect and photocopy the lists of all the twenty-nine precincts, the exercise of that right being subject to the same limitations which were imposed on him by the court regarding the inspection and copy of the lists of five of them, since the possibility of accomplishing the work in the twenty-nine precincts within the limitations and under the same conditions imposed by the court in its judgment with respect to the five precincts was a question of fact contingent on the form and manner of doing that work under the reasonable regulations adopted by the Supervisor to that effect. Under those conditions, the right acknowledged to the petitioners seems to depend on the fortuitous circumstance that the Local Board should not have possession of the lists corresponding to the five precincts of the island. In my opinion, within the sphere of application of § 409 of the Code of Civil Procedure, such a limitation operates as an unjustified restriction of the right sanctioned therein.

On the other hand, the uncontroverted evidence in the record is to the effect that as soon as the Supervisor was notified by the chairmen of the Local Boards of those five precincts that the corresponding lists were not in said Boards, he ordered that the same be made so that all the precincts should have them even though at the time of the hearing they had not yet been sent. The petitioners did not show that these five lists could not have been in the possession of the respective Boards within a reasonable time so that the petitioners could make use of them at the Local Boards in the same manner as it was done in the other precincts concerned.

For the reasons stated I was of the opinion that the issuance of the petition for mandamus did not lie, and I entered my dissent which I have now explained.