MARKMAN, J.

(concurring in part and dissenting in part).

PROLOGUE
Although to many the present dispute over font size may seem to be “much ado about nothing much” and a debate concerning a mere “technicality,” in which there may be only a “dime’s width” of difference between what is required of petitions by the law and what is actually contained in the petitions before the Court, a considerably larger issue is implicated: how faithful must the branch of government that interprets the law be to the language adopted by the branch of government that enacts that law? It is important to bear in mind that the very same constitutional provision that provides for the right of referendum also provides that it “must be invoked in the manner prescribed by law,” Const 1963, art 2, § 9, and it is the very same Constitution that provides for a representative form of government in which legislative majorities, not the views of a small percentage of the electorate, generally determine the course of public policy. Const 1963, art 4, § 1. As explained by Chief Justice Marshall in Marbury v Madison, 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803), *635 which has been the lodestar for generations of judges in questions of statutory construction, the responsibility of a court of law is to declare what the law is, and not what it ought to be. This is one of the first principles of our system of separated constitutional powers.
In this case, the law in dispute provides that a petition heading “shall” be in 14-point type, the law has been amended by the Legislature to repudiate the idea of “approximateness,” and the law explicitly limits the concept of “substantial compliance” to those circumstances in which a petition has been preapproved by the Secretary of State. The question then becomes whether “14-point type” means 14-point type. It is not, I believe, whether 10- or 12-point type is “close enough,” or whether 10- or 12-point type is sufficiently legible, or whether it is “Dickensian,” “crabbed,” “pedantic,” “hairsplitting,” or “hypertechnical” to distinguish between 10- or 12-point type and 14-point type. Instead, “we the people” of Michigan have determined that an extraordinary constitutional procedure — one enabling a small segment of the people to enjoin a duly enacted law for up to two years — “must be invoked in the manner prescribed by law. . . .” Have the proponents of the present referendum acted “in the manner prescribed by law”? Should this Court, for example, in reviewing a law requiring 200,000 signatures to place a referendum on the ballot, find that 199,250 signatures is sufficient and constitutes “substantial compliance”? Should this Court, in reviewing a law establishing a five-year statute of limitations period, find that a lawsuit or prosecution undertaken five years and two months after an event is sufficient and constitutes “substantial compliance”? And should this Court, in reviewing a law requiring that a real estate filing be made within 180 days of some occurrence, find that 185 days is sufficient and constitutes “substantial compliance”? Perhaps it *636 should, but it should also be understood that when the law is “relaxed,” or altered, in this manner, the law becomes less certain, more subject to judicial discretion and arbitrariness, less capable of clearly communicating to the people their rights and responsibilities, and more the subject matter of new lawsuits. To allow “substantial compliance” to satisfy the law when this has not been authorized by the Legislature is to accord more power to judges, and less power to legislative bodies and the people whom they represent, to say what the law “is.”
It is the obligation of the judiciary to interpret the law in reasonable accord with its language, and I believe this has been accomplished when a law requiring that a printed heading be set forth in “14-point type” is interpreted to require “14-point type.” It is neither a “strict” construction nor a “narrow” construction to render such an interpretation, but simply a “reasonable” construction — a construction that ordinary legislators and readers of the law would place upon this language. Had the Legislature been determined to ensure that certain petition headings would always be set forth in 14-point type, and that no gamesmanship would be tolerated in the form of such petitions, how could the Legislature have made this any more clear than by what it said in the law in dispute in this case? How could the Legislature have been any more straightforward in its intention to communicate that “this is what we intend, and only this, no more and no less”? The issue in this case, as it is in most cases before this Court, is more than the significance of a “dime’s width” of difference between “14-point type” and a smaller type on a petition; rather, it is which institution of government gets to make decisions regarding what will be provided for in the law — the branch comprised of persons broadly reflective of the people in their full *637 range of backgrounds, interests, and professions, or the branch comprised exclusively of lawyers?
ANALYSIS
To begin with, it must be emphasized that the issue before this Court has nothing to do with our own personal beliefs regarding the wisdom, or the lack thereof, of the emergency financial manager law, or of the constitutionality of this law. Plaintiff is incorrect in its assertion that “the only substantial difference between the petition at bar and the [ones in earlier years that have placed matters on the ballot] is the subject matter and viewpoint of the [plaintiff].” Rather, the only two issues before this Court are (a) whether plaintiff actually complied with the 14-point-type requirement in MCL 168.482(2), and (b) if it did not comply, whether “substantial compliance” with this requirement is tantamount to compliance with the law. Because I would answer both of these questions in the negative, I would reverse that part of the judgment of the Court of Appeals holding that “substantial compliance” with MCL 168.482(2) is sufficient to warrant a grant of mandamus, a position with which the judges of that Court disagreed but nonetheless felt obligated to follow because of an earlier precedent of that Court. Pursuant to the clear direction of MCL 168.544d, while “a form prescribed by the secretary of state” must substantially comply with MCL 168.482(2), a form not “prescribed by the secretary of state,” as in this case, must actually comply with that law. Therefore, although plaintiff suggests that our interpretation of the 14-point-type requirement in MCL 168.482(2) may prevent a number of petitions from reaching the ballot, each of the other petitions cited by plaintiff was apparently preapproved by the Board of State Canvassers, *638 and thus must only “substantially comply” with the 14-point-type requirement. Further, as highlighted on page 8 of plaintiffs own supplemental brief, even a cursory review of the other petitions will show that each is printed in visibly larger type than that in the instant petition.
(1) Plaintiff seeks a writ of mandamus against defendants. “Mandamus is an extraordinary remedy. . . .” Musselman v Governor, 448 Mich 503, 521; 533 NW2d 237 (1995). The plaintiff in a mandamus proceeding has the difficult burden of proving that the defendant has the clear legal duty to act in the way the plaintiff seeks. Double I Dev Co v Taylor Twp, 372 Mich 264, 269; 125 NW2d 862 (1964).
(2) Plaintiff urges this Court to direct that defendants certify for placement on the November 2012 general election ballot the referendum on Public Act 4 of 2011, MCL 141.1501 et seq., the Local Government and School District Accountability Act, commonly known as the emergency financial manager law. Generally, it is the right of the people of Michigan to have public policy determined by a majority of the people’s democratically elected representatives in the Legislature. However, “[ujnder the referendum clause of the Constitution [Const 1963, art 2, § 9] one-twentieth of the electors of the State may suspend the operation, until the next general election, of any act of the legislature, however important [with certain exceptions] .... Where a power so great as this is vested in a minority of the people, every safeguard provided by law against its irregular . . . exercise should be carefully maintained.” Thompson v Secretary of State, 192 Mich 512, 522-523; 159 NW 65 (1916).
(3) That is, there are constitutional rights in tension in this case, the constitutional right of the people to *639 have the enactments of representatives respected and given timely effect, i.e., the right to a republican form of self-government, see Const 1963, art 4, § 1; US Const, art IV § 4, and the right of the people under specified circumstances to enjoin the effects of such laws during the referendum process. Const 1963, art 2, § 9. Thompson has properly addressed this tension by both recognizing the importance of the referendum process and insisting that this process, which involves a departure from the ordinary constitutional process by which laws are formulated, be undertaken in a “regular” fashion and in compliance with the law.
(4) Const 1963, art 2, § 9 provides that “[t]he power of referendum. . . must be invoked in the manner prescribed by law . . . .”
(5) MCL 168.482(2) provides:
If the measure to be submitted proposes a constitutional amendment, initiation of legislation, or referendum of legislation, the heading of each part of the petition shall be prepared in the following form and printed in capital letters in 14-point boldfaced type .... [Emphasis added.]
As this Court has stated numerous times, the word “shall” constitutes a mandatory directive. See, e.g., Manuel v Gill, 481 Mich 637, 647; 753 NW2d 48 (2008).
(6) That the Legislature in 1965 amended MCL 168.482 by striking the language permitting the heading to be in “type of the approximate size set forth” and replaced it with the language, “shall be . . . in 14-point bold face type,” underscores that the Legislature meant “shall be” to constitute a mandatory directive. (Emphasis added.)
(7) MCL 168.544d provides:
Nominating petitions for the offices under this act and petitions for a constitutional amendment, initiation of *640 legislation, or referendum of legislation or a local proposal may be circulated on a countywide form. Petitions circulated eountywide shall be on a form, prescribed by the secretary of state, which form shall be substantially as provided in sections 482, 544a, or 544c, whichever is applicable. The secretary of state may provide for a petition form larger than 8-V2 inches by 13 inches and shall provide for identification of the city or township in which the person signing the petition is registered. The certificate of the circulator may be on the reverse side of the petition. This section does not prohibit the circulation of petitions on another form prescribed by this act. [Emphasis added.]
Accordingly, while “a form prescribed by the secretary of state” may “substantially comply” with MCL 168.482(2), a form not “prescribed by the secretary of state” must actually comply with MCL 168.482(2). To the extent that Bloomfield Charter Twp v Oakland Co Clerk, 253 Mich App 1; 654 NW2d 610 (2002), an opinion of the Court of Appeals, suggests that all petition forms, regardless of whether they were “prescribed by the secretary of state,” need only “substantially comply” with MCL 168.482(2), it is wrong, in my judgment, because it is plainly inconsistent with the law. Therefore, I agree with the three other justices who conclude that the “substantial compliance” standard does not apply to forms that have not been “prescribed by the secretary of state.”
(8) The form at issue in this case was not “prescribed by the secretary of state” because it was not preapproved by the Secretary of State, and it is not in compliance with the Secretary of State’s own rule that the heading “shall be printed in capital letters in 14-point boldface[d] type . . . .” Secretary of State memorandum, Initiative and Referendum Petitions — Prescribed Format (revised June 2011), p 2. Therefore, the form must actually comply with MCL 168.482(2). As explained in the Secretary of State’s memorandum, *641 Initiative and Referendum Petitions (January 2011), p 1, “While Michigan election law does not require the pre-approval of an initiative or referendum petition form, such approval greatly reduces the risk that signatures collected on the form will be ruled invalid due to formatting defects.”
(9) Both MCL 168.482(2) and the Secretary of State’s own rule require the heading on the form to be “printed in capital letters in 14-point boldfaced type.”
(10) The term “point” in the printing context is defined as “a unit of type measurement equal to ... V72 inch----” Random House Webster’s College Dictionary (2d ed, 1997), p 1006; see also Webster’s New Collegiate Dictionary (1960), p 652 (“The value of the point is .013837 inch, or nearly V72 inch.”), and Spicer v Hartford Fire Ins Co, 171 Va 428, 432; 199 SE 499 (1938) (“An inch is the American standard of linear measure.... A like standard, while it may not be so generally known, is now used in ascertaining the size of type____[T]he point system of measuring type... was adopted in 1886 by the United States Type Founders’ Association, although prior to that time many founders were using it.”).
(11) The term “type” is defined consistently among dictionaries as being “a wood or metal block with a raised character on its surface that, when fixed into a press and coated with ink, prints an impression of the character on paper or a similar absorbent surface” or “a printed character or printed characters.” Random House Webster’s College Dictionary (2d ed, 1997), p 1391; see also Webster’s New Collegiate Dictionary (1960), p 921 (“A rectangular block, usually of metal or wood, having its face so shaped as to produce, in printing, a letter, figure, or other character” or “the letters or characters impressed, collectively.”). There *642 fore, we must determine whether the term “type” in MCL 168.482(2) refers to the blocks used to produce the letters or to the actual printed letters themselves, and, contrary to Justice MARY BETH Kelly’s contention, which of these definitions is ultimately controlling is hardly undisputed. Indeed, this matter is at the very heart of the dispute between plaintiff and the Governor, the Attorney General, and the intervening defendant. Also, contrary to the Chief Justice’s and Justice MARY BETH Kelly’s contention, and as is obvious in the language in this very paragraph, I do not “ignore” these alternative definitions, ante at 627 n 8, or “omit[] the definition’s reference to blocks,” ante at 609 n 40. Instead, I see fit to explain exactly why I believe the statute is better understood to incorporate the latter definition. See infra ¶¶ 12-16. Indeed, it is the Chief Justice who defines “type” as “a printed impression from type,” ante at 624 n 4, but who “omits” the remainder of that definition that defines type without reference to letter blocks, to wit, “a printed impression from type: printed matter every small type can be hard to read>.”
(12) “Individual words and phrases, while important, should be read in the context of the entire legislative scheme.” Mich Props, LLC v Meridian Twp, 491 Mich 518, 528; 817 NW2d 548 (2012). In the statute at issue here, the term “type” is used in a provision that states that “the heading of each part of the petition shall be . . . printed in capital letters in 14-point boldfaced type.” MCL 168.482(2) (emphasis added). That the Legislature specifically used the words “printed” and “letters” indicates that the Legislature was referring to the actual printed letters rather than the blocks used to make these letters. That the Legislature used the word “in” rather than *643 “with” in two relevant places in the statute underscores this interpretation. The Chief Justice gives no consideration at all to this statutory language.
(13) Interpreting “type” to mean the actual printed letters is also consistent with the only reasonable legislative purpose that can be served by MCL 168.482(2), to wit, ensuring that the signers of petitions can easily read what it is that they are signing. Interpreting “type,” on the other hand, to mean the blocks used in letter-press printing to produce letters would serve no conceivable purpose because the size of a block says nothing about the size of the letter produced by that block. Thus, requiring the preparer to merely use blocks that are physically 14/72 of an inch in size would permit the actual printed letters on the petition to be of the very smallest and most unreadable size.
(14) It is noteworthy that the Chief Justice, who adopts the block argument, cites a treatise on printing that was written in 1918, but by 1954, when MCL 168.482(2) was originally enacted, there were many other methods of printing in addition to the less advanced letter-press method that requires individual blocks. For example, a printing press can use plates and does not require movable letter blocks; and offset printing uses a polyester or metal plate and does not require moveable letter blocks. All of these methods of printing, as well as others, were employed by 1954. Thus, the more reasonable interpretation of “type” is not “a wood or metal block... fixed into a press,” because this suggests that only printed letters produced by a letter-press are compliant with the statute. This underscores that the “block” definition of “type” unnecessarily focuses on the method of production, rather than on the result of production, the text or type produced. While the former has no bearing on what will *644 actually be read by potential signers of petitions, the latter focuses precisely on what those signers will read.
(15) Indeed, given that blocks are increasingly not used in the modern printing industry, it is difficult to conceive of how this Court, or the Secretary of State, or the Board of State Canvassers, or the parties themselves could practically and accurately determine whether the “14-point type” requirement of MCL 168.482(2) has been satisfied in a given instance if “type” means blocks. There are no such blocks in this case because the 14-point Calibri font that was used on this petition was not produced by blocks. Indeed, the Calibri font did not even exist when printing blocks were more widely used.
(16) For these reasons, unlike the justices who adopt the printer’s-block argument, I do not believe that the 14-point-type requirement of MCL 168.482(2) can be reasonably understood to refer to the size of the blocks used to print the letters; instead, I believe it must refer to the actual printed letters or characters.
(17) That MCL 168.482(2) refers to “the heading,” and that “type” refers to “printed characters” or “letters or characters impressed, collectively” suggests that the grouping of letters that comprises the heading should be considered as a whole in determining the point size of the type. This is buttressed by the statute’s requirement that “capital letters” must be printed “in 14-point boldfaced type.” (Emphasis added.) That the statute specifies that the “letters” must be printed in the specified “type” strongly implies that the “type” must be considered as a whole in evaluating whether the point-size requirement has been satisfied. Contrary to Justice Mary Beth Kelly’s contention, I do not conclude that the actual printed characters must each measure 14/72 of an inch high, nor do I adopt different *645 ways of measuring type under. MCL 168.482(2), (3), and (5). Rather, when measuring type under any of these statutory provisions, I conclude only that the language must be collectively measured as described in ¶ 18, infra.
(18) As the Court of Appeals explained, the customary practice in the printing industry is to use a specialized printer’s ruler to determine the type size of printed text. Stand Up For Democracy v Secretary of State, 297 Mich App 45, 66 n 10; 824 NW2d 220 (2012). A typical printer’s ruler has a scale to measure points, as well as the graduated-sized letter “E” in order to visually represent the range of type size, known as the “E-scale.” To determine the point size of the printed text, the ruler is used to measure the distance in points between the ascender height, e.g., the top of the “h,” and the descender height, e.g., the bottom of the “p.” Thus, although a document may be printed in 14-point type, the actual point size of each letter will vary (e.g., a lowercase “x” will always be significantly less than 14/72 of an inch because it does not contain an ascender or descender). In fact, all individual letters in 14-point type will measure less than 14/72 of an inch because no letter in the English alphabet has both an ascender and a descender. If the printed text does not contain a letter with an ascender and a letter with a descender, the “E-scale” may still be used by comparing an E (or its nearest equivalent) in the text to the ones printed on the ruler. If an “E” in the text measures 14 points on the “E-scale,” the type is “in 14-point.”
(19) Although it is undisputed that the “font” used in the heading in this case was categorized by the Microsoft software as “14-point,” it is also undisputed that the actual size of the printed “type” varies widely depending upon the particular “font” chosen. In other *646 words, a 14-point Calibri font may be of a considerably different type size than a 14-point Arial font. As the Court of Appeals correctly explained, “ ‘font’ is not a unit of measurement.” Stand Up For Democracy, 297 Mich App at_n 11, slip op p 12 n 11 (emphasis in original). That the Legislature imposed a “14-point type” requirement shows an intent to impose a specific type-size requirement, regardless of the particular font chosen.
(20) Justice Mary Beth Kelly’s finding that there is “actual compliance” turns on the fact that Microsoft “defines ‘font size’ as the ‘size of type ....’” Ante at 614. Although she recognizes that Microsoft does not purport in this definition to define “type,” she assumes that Microsoft has employed the “printer’s block” definition of “type” that she has earlier articulated. However, there is simply no evidence for that conclusion. In fact, the full definition of “font size” provided by Microsoft is:
The size of type, measured in points between the bottom of the descender and the top of the ascender (the vertical point size of a font). Sometimes referred to as the Type or Point Size. [Microsoft Support, WD2002: Definitions of Typography Terms in Word <http://support.microsoft.com/kb/ 192973/en-us> (accessed August 1, 2012).]
This definition supports my ascender/descender measurement set forth in ¶ 18 supra, and not Justice MARY Beth Kelly’s “invisible box” argument. Indeed, the diagram on the very same Microsoft typography page cited by Justice MARY BETH KELLY further illustrates that it is the height of the letters — from highest ascender to lowest descender — that controls, not the invisible box. For these reasons, I respectfully disagree with Justice MARY BETH KELLY, who concludes that because plaintiff’s petition heading is *647 printed in a 14-point font, it “actually complies” with the 14-point-iype requirement in MCL 168.482(2). By this analysis, the Legislature’s ability to ever impose a specific type-size requirement in order to assure a minimum standard of legibility would be entirely frustrated.
(21) Because the heading on the form here is smaller than 14 points as measured by an E-scale ruler (and considerably so), the form is clearly not in compliance with either MCL 168.482(2) or the Secretary of State’s rule. Therefore, plaintiff has failed to satisfy its burden of proving that defendants have any legal duty, much less a clear legal duty, for purposes of mandamus relief to certify the instant referendum for placement on the ballot.
(22) Although plaintiff argues that in the past 15 years at least 14 referendums have been placed on the statewide ballot even though their headings were also not 14 points in size, plaintiff acknowledges that all of those referendums were preapproved by the Secretary of State. Given this preapproval, those forms would only have had to “substantially comply” with MCL 168.482(2). Plaintiff, on the other hand, did not seek the Secretary of State’s preapproval, and thus was required to actually comply with MCL 168.482(2), which it did not do.
(23) Further, it is telling that on page 8 of plaintiffs own supplemental brief, of the six other petition headings set forth in connection with matters that might appear on this year’s ballot, each is in larger type than plaintiffs and five of these are in an identical or nearly identical typeface. While plaintiff may, or may not, be correct that its own heading “stands out for readability,” it also stands out in the distinctiveness of its type size. Moreover, as the Board of State Canvassers and the Secretary of State indicate, the six other petitions *648 this year were each preapproved by the board, and thus subject only to substantial compliance with MCL 168.482(2).
(24) Concerning the approach of the remanding justices, I see no benefit to be derived from this approach, and the remanding justices fail to explain what the benefit might be. That is, no matter which justice among us has correctly identified the proper method of measuring type, all of the information necessary to assess whether plaintiffs petition satisfies the statute is already before us. See infra ¶¶ 25-27. Given existing time constraints, returning this case to the board would serve no purpose other than to effectively make the board, not this Court, the court of last resort on this issue. Before we do that, I would prefer to make the Court of Appeals the court of last resort, because that is what the Constitution and laws of our state certainly contemplate. I would not remand to the board without first providing it with relevant judicial guidance regarding what the law requires. The board has already deadlocked on the issue of type size and that is why this case is before the Court in the first place.
(25) First, if one adopts the “character size” approach, as I do, a remand is not warranted because MCL 168.482(2) requires the heading to be printed in 14-point type as measured by an E-scale ruler and the intervening defendant has submitted an affidavit that asserts that the heading in this case is not printed in 14-point type as measured by an E-scale ruler, and plaintiff has not argued to the contrary. Further, as the Court of Appeals explained, “[bjecause 14-point is a unit of measurement easily determined by use of an E-scale ruler, neither this Court nor the Board requires expert testimony to determine whether the correct measurement has been met.” Stand Up For Democracy, *649 297 Mich App at 66 n 10. That is, we can determine ourselves that “the heading on plaintiffs petition only measures 12 point on an E-scale ruler,” id. at 67, and no remand to an expert body is required. What possible benefit would be derived from such a remand?
(26) Second, if one adopts the “printer’s block” approach, as do the remanding justices, a remand is again unwarranted. The intervening defendant has also submitted an affidavit that provides that plaintiffs heading is clearly smaller than the same heading printed with a variety of 14-point blocks that it has obtained, and again plaintiff has not argued to the contrary. That is, while the intervening defendant has presented evidence that neither the actual printed letters nor the blocks satisfy the 14-point requirement, plaintiff has presented no contrary evidence. Instead, it has been the dominant focus of plaintiffs argument throughout this case that it has “substantially complied” with MCL 168.482(2) and that the difference between the 14-point type required by the statute and the type used in its petition heading, which measures 12 points on an E-scale ruler, amounts to merely a “dime’s width of a difference.” What possible benefit would be derived from a remand?
(27) Third, if one adopts the “font” approach, as do plaintiff and Justice MARY BETH KELLY, a remand is not warranted given that there is no dispute that plaintiffs petition was in 14-point Calibri font. What possible benefit would be derived from a remand?
(28) Further, for the same reasons that I do not believe that “substantial compliance” constitutes the appropriate legal standard, it is unclear to me how the remanding justices’ “faithful replication” standard, in which the board must assess whether the letters pro *650 duced by Microsoft’s 14-point Calibri font are dose enough to the letters produced by a 14-point Calibri block, if such a block can even be found, is any different than the “substantial compliance” standard that these justices themselves reject.
(29) For all these reasons, I would reverse that part of the judgment of the Court of Appeals holding that “substantial compliance” with MCL 168.482(2) is sufficient to warrant a grant of mandamus.